No. 22-1231

———————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————————

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Plaintiff-Appellant,

v.

CHARTER COMMUNICATIONS, LLC,
Defendant-Appellee.

———————————————

On Appeal from the United States District Court
for the Eastern District of Wisconsin
No. 18-cv-1333

———————————————

**OPENING BRIEF FOR PLAINTIFF-APPELLANT
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

———————————————

CHRISTOPHER LAGE
*Deputy General Counsel*

JENNIFER S. GOLDSTEIN
*Associate General Counsel*

ANNE NOEL OCCHIALINO
*Acting Assistant General Counsel*

CHELSEA C. SHARON
*Attorney, Appellate Litigation Services*
*Office of General Counsel*
*Equal Employment Opportunity Commission*
*131 M St. NE, Fifth Floor*
*Washington, DC 20507*
*(202) 921-2889*
*chelsea.sharon@eeoc.gov*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................iii

INTRODUCTION ..........................................................................................................1

STATEMENT OF JURISDICTION ...............................................................................1

STATEMENT OF THE ISSUES ....................................................................................2

PERTINENT STATUTORY AND REGULATORY PROVISIONS...............................2

STATEMENT OF THE CASE .......................................................................................2

     A.    Statutory and Regulatory Framework ...............................................2

     B.    Factual Background .........................................................................4

     C.    District Court Decision....................................................................8

SUMMARY OF THE ARGUMENT ..............................................................................10

STANDARD OF REVIEW ............................................................................................11

ARGUMENT ..................................................................................................................12

     A.    Kimmons' disability is relevant to the performance of essential job functions as required by *Brumfield* because it prevented him from driving safely home from his work site following his assigned shift...............12

     B.    If necessary, this Court should revisit *Brumfield* pursuant to Circuit Rule 40(e) to hold that reasonable accommodations may be required even if unrelated to the performance of essential job functions......................22

     1.    The text of the ADA makes clear that reasonable accommodations may be required even when an employee can perform essential job functions without them.........................................................................22

     2.    Assuming, *arguendo*, that the text of the ADA is ambiguous, this Court should defer to EEOC's regulation clarifying that employers must provide accommodations for purposes beyond performance of essential job functions...................................................................28

     3.    *Brumfield* conflicts with the precedent of this and other courts......................29

CONCLUSION.................................................................................................................33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATEMENT REGARDING SHORT APPENDIX

ADDENDUM

SHORT APPENDIX

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bay v. Cassens Transp. Co.*,
  212 F.3d 969 (7th Cir. 2000)............................................................................26

*Bell v. O'Reilly Auto Enters., LLC*,
  972 F.3d 21 (1st Cir. 2020) ....................................................................... 24, 31

*Brooks v. Walls*,
  279 F.3d 518 (7th Cir. 2002)............................................................................20

*Brumfield v. City of Chi.*,
  735 F.3d 619 (7th Cir. 2013)......................................................................*passim*

*Buckingham v. United States*,
  998 F.2d 735 (9th Cir. 1993)............................................................................31

*Bultemeyer v. Fort Wayne Cmty. Schs.*,
  100 F.3d 1281 (7th Cir. 1996) ................................................................... 27, 28

*Burnett v. Ocean Props., Ltd.*,
  987 F.3d 57 (1st Cir. 2021) ...............................................................17, 21, 32

*Cal. v. Dep't of Toxic Substances Control v. Westside Delivery, LLC*,
  888 F.3d 1085 (9th Cir. 2018) .........................................................................25

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)................................................................................. 26, 29

*Cleveland v. Pol'y Mgmt. Sys. Corp.*,
  526 U.S. 795 (1999).........................................................................................2

*Cloe v. City of Indianapolis*,
  712 F.3d 1171 (7th Cir. 2013) .........................................................................19

*Colwell v. Rite Aid Corp.*,
  602 F.3d 495 (3d Cir. 2010) ...........................................................15, 16, 19, 21

*EEOC v. Kaiser Found. Health Plan of Ga., Inc.*,
  No. 19-CV-5484-AT, 2021 WL 3508533 (N.D. Ga. Aug. 9, 2021) ......................... 21, 32

*EEOC v. Life Techs. Corp.*,
  No. WMN-09-2569, 2010 WL 4449365 (D. Md. Nov. 4, 2010)................................. 24, 29

*EEOC v. Sears, Roebuck & Co.,*
    417 F.3d 789 (7th Cir. 2005)................................................................................ 18, 20

*Fedro v. Reno,*
    21 F.3d 1391 (7th Cir. 1994)......................................................................................30

*Feist v. La. Dep't of Just.,*
    730 F.3d 450 (5th Cir. 2013)............................................................. 16, 22, 29, 31, 32

*Filar v Bd. of Educ. of City of Chi.,*
    526 F.3d 1054 (7th Cir. 2008) ...........................................................................*passim*

*Fuller v. Belleville Area Cmty. Coll. Dist. No. 522,*
    No. 3:18-cv-01123-GCS, 2020 WL 1287743 (S.D. Ill. Mar. 18, 2020) ............... 19, 21, 22

*Gile v. United Airlines, Inc.,*
    213 F.3d 365 (7th Cir. 2000)................................................................................ 19, 32

*Hendon v. Wis. Bell, Inc.,*
    No. 16-C-0941, 2018 WL 1885678 (E.D. Wis. Apr. 19, 2018) .................................19

*Hill v. Assocs. for Renewal in Educ., Inc.,*
    897 F.3d 232 (D.C. Cir. 2018) ..................................................................................31

*Hooper v. Proctor Health Care Inc.,*
    804 F.3d 846 (7th Cir. 2015).....................................................................................13

*Humphries v. CBOCS W., Inc.,*
    474 F.3d 387 (7th Cir. 2007).....................................................................................31

*Johnson v. Bd. of Trs. of Boundary Cnty. Sch. Dist. No. 101,*
    666 F.3d 561 (9th Cir. 2011).....................................................................................27

*Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.,*
    201 F.3d 894 (7th Cir. 2000).....................................................................................17

*Livingston v. Fred Meyer Stores, Inc.,*
    388 F. App'x 738 (9th Cir. 2010) ..............................................................................16

*Lucas v. W.W. Grainger, Inc.,*
    257 F.3d 1249 (11th Cir. 2001) .................................................................................28

*Luckett v. Dart,*
    No. 14-CV-6089, 2017 WL 3386117 (N.D. Ill. Aug. 7, 2017) .................................13

*Lyons v. Legal Aid Soc'y,*
    68 F.3d 1512 (2d Cir. 1995)).......................................................................... 16, 21, 28

*Marx v. Gen. Revenue Corp.*,
568 U.S. 371 (2013) ................................................................................................26

*McWright v. Alexander*,
982 F.2d 222 (7th Cir. 1992) ..................................................................................30

*Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*,
600 F.3d 878 (7th Cir. 2010) ..................................................................................11

*PGA Tour, Inc. v. Martin*,
532 U.S. 661 (2001) ..................................................................................................2

*Richardson v. Chi. Transit Auth.*
926 F.3d 881 (7th Cir. 2019) ..................................................................................26

*Sanchez v. Vilsack*,
695 F.3d 1174 (10th Cir. 2012) ................................................................29, 30, 31

*Scalera v. Electrograph Sys., Inc.*,
848 F. Supp. 2d 352 (E.D.N.Y. 2012) ....................................................................24

*Spiegla v. Hull*,
371 F.3d 928 (7th Cir. 2004) ..................................................................................30

*Stokes v. Nielsen*,
751 F. App'x 451 (5th Cir. 2018) (per curiam) ......................................................30

*Sturz v. Wis. Dep't of Corr.*,
642 F. Supp. 2d 881 (W.D. Wis. 2009) ..................................................................22

*United States v. Howze*,
343 F.3d 919 (7th Cir. 2003) ............................................................................30, 31

*United States v. Polichemi*,
201 F.3d 858 (7th Cir. 2000) ..................................................................................20

*US Airways, Inc. v. Barnett*,
535 U.S. 391 (2002) ................................................................................................32

*Waggoner v. Olin Corp.*,
169 F.3d 481 (7th Cir. 1999) ..................................................................................17

*Watson v. Lithonia Lighting*,
304 F.3d 749 (7th Cir. 2002) ..................................................................................27

*Whitaker v. Wis. Dep't of Health Servs.*,
849 F.3d 681 (7th Cir. 2017) ..................................................................................27

v

*White v. Scibana*,
  390 F.3d 997 (7th Cir. 2004).................................................................29

*Wilkerson v. Shinseki*,
  606 F.3d 1256 (10th Cir. 2010)............................................................27

*Yochim v. Carson*,
  935 F.3d 586 (7th Cir. 2019)................................................................18

**Statutes**

28 U.S.C. § 1291.......................................................................................2

28 U.S.C. § 1331.......................................................................................1

Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*.........*passim*

  42 U.S.C. § 12101(a)(5).......................................................................23

  42 U.S.C. § 12101(a)(7).......................................................................21

  42 U.S.C. § 12101(b)(1).........................................................................2

  42 U.S.C. § 12111(8)......................................................................*passim*

  42 U.S.C. § 12111(9)..............................................................................3

  42 U.S.C. § 12111(9)(A)................................................................*passim*

  42 U.S.C. § 12111(9)(B).......................................................................15

  42 U.S.C. § 12111(10)(A).....................................................................32

  42 U.S.C. § 12112(a)......................................................................*passim*

  42 U.S.C. § 12112(b)..............................................................................3

  42 U.S.C. § 12112(b)(1).......................................................................23

  42 U.S.C. § 12112(b)(5)(A)............................................................*passim*

  42 U.S.C. § 12116.................................................................................29

  42 U.S.C. § 12117(a)..............................................................................1

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*.........1

  42 U.S.C. § 2000e-5(f)(1)......................................................................1

42 U.S.C. § 2000e-5(f)(3) .................................................................................................. 1

## Rules and Regulations

29 C.F.R. § 1630.2(m) ...................................................................................................4, 26

29 C.F.R. § 1630.2(o)(1) ............................................................................................. 28, 29

29 C.F.R. § 1630.2(o)(2) ................................................................................................... 15

29 C.F.R. § 1630.2(o)(4) ................................................................................................... 31

29 C.F.R. pt. 1630, app. § 1630.2(o) ............................................................................... 32

29 C.F.R. pt. 1630, app. § 1630.9 ....................................................................... 26, 27, 31

Fed. R. App. P. 4(a)(1)(B) .................................................................................................. 2

Seventh Circuit R. 40(e) .............................................................................................*passim*

## Other Authorities

Docket, *Brumfield v. City of Chi.*,
    10-cv-4960 (N.D. Ill.) ................................................................................................ 12

Docket, *Brumfield v. City of Chi.*,
    11-3836 (7th Cir.) ...................................................................................................... 29

H.R. Rep. No. 101-485, pt. 2 (1990), *as reprinted in*
    1990 U.S.C.C.A.N. 330 .............................................................................................. 15

## INTRODUCTION

This case is about Charter Communications, LLC (Charter)'s refusal to provide James Kimmons—a sales representative with cataract-related night blindness—with an accommodation Kimmons needed to allow him to drive safely home from his workplace following his assigned shift. Although Charter initially granted Kimmons a temporary shift change to allow him to avoid driving home from work in the dark, Charter then refused to extend the accommodation for another thirty days. In so doing, Charter pointed to no undue hardship that would result from this brief extension and provided no explanation for why a request granted mere weeks before had suddenly become unreasonable. Instead, Charter claimed only that the ADA imposed no obligation at all to provide any accommodation related to an employee's commute. This conclusion, however, runs contrary to the text and legislative history of the ADA and the case law of this Court and other circuits, all of which recognize that an employer must provide reasonable accommodations that allow disabled individuals to readily access the workplace and perform their essential job functions.

## STATEMENT OF JURISDICTION

The Equal Employment Opportunity Commission (EEOC) brought this enforcement action alleging that Charter violated the Americans with Disabilities Act (ADA), as amended, 42 U.S.C. §§ 12101 *et seq.*, by failing to provide a reasonable accommodation to Kimmons. R.1 at 1.[1] The district court had jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5(f)(1), (3)). On December 17, 2021, the district court granted summary judgment in Charter's favor and entered final judgment against EEOC. R.60; R.61. On February 14, 2022,

---

[1] "R.#" refers to the district court docket entry. The page numbers refer to the CM/ECF numbers appended to each document except in the case of deposition testimony, where they refer to the internal pagination given by the reporting company. Where a cited document is included in the attached short appendix, "A-#" refers to the pertinent page number(s) in the appendix.

EEOC timely filed a notice of appeal. R.69; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.   Whether the district court erred in holding that Kimmons' disability was irrelevant to his ability to perform his essential job functions—and that under *Brumfield v. City of Chicago*, 735 F.3d 619 (7th Cir. 2013), this relieved Charter of any duty under the ADA to accommodate him—where Kimmons' cataract-related night blindness prevented him from driving safely home from work following his assigned shift.

2.   If this Court reads *Brumfield* as foreclosing even those accommodations necessary to ensure safe access to the workplace, whether this Court should revisit *Brumfield* pursuant to Circuit Rule 40(e) because, so interpreted, that decision's holding is contrary to the text of the ADA, EEOC regulations, and the precedent of this Court and other circuits.

## PERTINENT STATUTORY AND REGULATORY PROVISIONS

Pertinent statutory and regulatory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.      Statutory and Regulatory Framework

Congress enacted the ADA to create a "comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). "The ADA seeks to eliminate unwarranted discrimination against disabled individuals in order both to guarantee those individuals equal opportunity and to provide the Nation with the benefit of their consequently increased productivity." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 801 (1999). "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment . . . ." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001).

The ADA's prohibitions against employment discrimination are set forth in Title I at 42 U.S.C. § 12112. Section 12112(a) provides: "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Section 12112(b) states that "[a]s used in subsection (a), the term 'discriminate against a qualified individual on the basis of disability' includes" a list of specified employer actions. 42 U.S.C. § 12112(b)(1)-(7). One such specified action is "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," absent undue hardship. *Id.* § 12112(b)(5)(A).

Title I's definitional provision states that "[t]he term 'reasonable accommodation' may include":

> (A)  making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B)  job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.* § 12111(9).

Congress expressly authorized EEOC to issue regulations to implement Title I of the ADA. 42 U.S.C. § 12116. Consistent with the statute, EEOC's implementing regulations provide that "[t]he term reasonable accommodation means":

> (i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or
>
> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that

3

> enable an individual with a disability who is qualified to perform the essential functions of that position; or
>
> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1)(i)-(iii).

The statute bars discrimination against "qualified individual[s]." 42 U.S.C. § 12112(a). The statute defines the term "qualified individual" as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). EEOC's implementing regulations further provide that:

> [t]he term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position.

29 C.F.R. § 1630.2(m).

**B.    Factual Background**

James Kimmons experiences cataracts that cause blurred vision and difficulty with glare that interfere with night driving. R.30-5 at 30:3-15, 46:2-14; R.30-55 at 38:6-24, 75:6-23. Dr. Bruce Savin, an optometrist with more than forty years of experience who treated Kimmons, testified that cataracts cause "[t]he crystal clear lens that is in the eye" to "develop opacities within the lens itself. It can be a yellowish hazing called sclerosis, but also can be in the form of . . . spokes, sheets or dots even. It's like throwing debris against a window in your house. If you have enough of that block the window, you can't see anymore." R.30-55 at 13:20-23, 38:16-23. Dr. Savin noted that even mild cataracts can "cause . . . problems" when they are "central to [the] line of sight in the center of the lens," like Kimmons' cataracts were. R.30-55 at 39:16-22. Dr. Savin further explained that cataracts

4

can impact night driving because they cause "diminished visual acuity" and blurriness that "typically bothers a patient more in the dark and that's typically night driving." R.30-55 at 75:12-14. In addition, glare exacerbates cataracts because "[l]ight rays are being reflected off of those particles or areas of debris in the lens of the eye. The opacities that are appearing in the lens will cause the light to scatter and reflect." R.30-55 at 75:19-23. Dr. Savin observed in his examination notes that Kimmons suffered from "cat[aract] related blurred [vision]" and recommended that he "consider avoiding night driving—even with new spect[acle prescription]." R.30-59 at 4; *see also* R.30-57 at 5 (subsequent treatment notes documenting that Kimmons was "cautioned about glare").

In January 2016, Kimmons applied to work at Time Warner Cable (which Charter acquired later that year). R.34-10; R.34-5 at 12:19-13:1. Kimmons lived in Racine, Wisconsin, about 36 miles (or about a one-hour drive) from the Milwaukee call center where his duties were to be performed. R.30-5 at 31:23-32:2. Kimmons asked about a flexible schedule during the interview process, explaining that he did not drive well at night, and the interviewers responded "[o]h, we can get you out of here [before dark], don't worry about that." R.30-5 at 40:3-16.

Charter hired Kimmons as an Inside Sales and Retention Representative in March 2016. R.30-5 at 33:7-12. According to Charter's Director of Human Resources, the primary duties of such representatives are to "answer the calls that come in" with an eye toward "retain[ing] existing customers" and attempting to "upgrade to services they do not have." R.34-6 at 19:4-15. During his new-hire training period, Kimmons worked from 8:00 a.m. to 5:00 p.m. R.30-5 at 60:22-25. After he completed his new-hire training in June 2016, Kimmons received a 12:00 p.m. to 9:00 p.m. shift based on Charter's shift-selection lottery system. R.30-5 at 59:11-60:2. Kimmons explained that this shift "was the only shift that was left" when it was his turn to select during the lottery. R.30-5 at 59:17.

5

After receiving this shift assignment, Kimmons made a verbal request for a shift change to his supervisor, citing his night blindness. R.30-5 at 65:10-66:19. Kimmons' supervisor denied this first request. R.30-5 at 65:10-66:19, 84:15-19. Kimmons submitted a second accommodation request in writing dated July 5, 2016, explaining that he did "not drive well after dark at night" and "[w]ou[l]d like to request a[n] earlier shift" that would allow him "to be off the highways before dark" or to access public transportation, which was unavailable "at th[e] late hour" that his current shift ended. R.34-13 at 3. Kimmons requested "to be on a shift starting no lat[]er than 9:00 [a.m.]" which would "allow [him] not to have to be on the highways" after dark. R.34-13 at 3.

Kimmons submitted two physician certification forms in connection with this accommodation request—one from his optometrist, Dr. Savin, and one from his primary care physician, Dr. Reginald Adams. R.30-20; R.30-21. Dr. Savin's form noted a diagnosis of cataracts and explained that "[d]ue to glare caused by cataracts night glare + strain may be reported by patients + were reported as issues per Mr. Kimmons['] exam." R.30-20 at 2. Dr. Adams' form likewise observed that Kimmons' condition causes "difficulty driving after dark" and "[s]everely impairs his night vision." R.30-21 at 3.

Charter issued an employer response form dated August 9, 2016, with the box checked indicating that "[a]ll of part of employee's accommodation(s) request is approved." R.34-14 at 2. Charter assigned Kimmons to a 10:00 a.m. to 7:00 p.m. shift (rather than a shift starting before 9:00 a.m. as Kimmons had requested). R.34-14 at 2. Charter also agreed to the accommodation only for a temporary thirty-day period to expire on September 6, 2016. R.34-14 at 2. The form contained boxes that Charter could check to indicate that the requested accommodation was "not related to an essential function of the employee's job" or that the accommodation would result in "undue business hardship," but Charter did not check either of these boxes. R.34-14 at 2.

6

On August 29, 2016, before the thirty-day period ended, Kimmons requested a thirty-day extension of his shift accommodation, explaining that he was working to negotiate termination of his lease with the intent to move to Milwaukee but could not be released from his lease until October. R.34-16 at 3. Charter's Vice President of Operations, Romona Henderson, denied this request only a few hours after Kimmons submitted it. R.34-16 at 2-3. Henderson did not ask for any additional medical information or explain why Charter would not grant this thirty-day extension after approving the initial shift accommodation, instead stating simply that Kimmons should look into other ways to manage his transportation on his own. R.34-16 at 3. Kimmons explained that no public transportation to Racine was available at the hour his shift ended, but Henderson merely replied that he could look into carpooling or take public transportation partway and find additional transportation the rest of the way. R.34-16 at 2. Kimmons checked with the "bus system to see if they had transportation to Racine after 9:00 [p.m.] and they [did not]" and sought out information from Charter about other employees who lived in Racine but "was told that was confidential information." R.30-5 at 124:19-21, 125:9-20. Charter did not offer Kimmons any alternative accommodations to assist with his cataract-related difficulties getting home from work. R.30-32 at 85:1-9.

Kimmons sent an email to Charter's Employee Services Center asking about a mediation process to appeal the accommodation denial. R.34-19 at 2. An individual from the Employee Services Center responded that "what you are asking for is assistance with a commute, which is not required under the ADA. The Company has been kind enough to temporarily change your shift while you attempted to find alternative assistance for your commute, even though it had no legal obligation to do so." R.34-19 at 2.

Charter's written policies state that examples of reasonable accommodations include making changes to an employee's schedule. R.34-15 at 3 (Charter's ADA Interactive Process Worksheet

indicating that "[a] reasonable accommodation may include . . . modifying work schedules"); R.34-18 at 21 (Charter ADA training listing "[a]llow[ing] an employee to come in earlier or later" as examples of potential accommodations). Several Charter employees testified that the company had allowed shift changes as accommodations for other employees and had also allowed employees to informally switch shifts in certain situations. R.30-32 at 60:17-61:20; R.30-34 at 52:20-53;10; R.34-5 at 43:7-23; R.34-6 at 80:20-81:15; R.34-7 at 69:1-11.

After Charter refused to extend Kimmons' accommodation, he returned to the 12:00 p.m. to 9:00 p.m. shift on September 7, 2016, and continued to work that schedule until Charter terminated him for unrelated reasons on January 25, 2017. R.30-25; R.30-5 at 144:4-10, 148:17-23. Kimmons managed to get to and from work through a combination of public transportation and rides from his girlfriend and various friends. R.30-5 at 69:5-70:17, 149:12-20. Kimmons testified that this arrangement was difficult because his girlfriend was often "running late" to pick him up or drop him off, because she grew frustrated with his requests, and because it was "hard to ask somebody to come get [him]" given uncertainty about his schedule. R.30-5 at 67:25-68:5, 150:1-9.

On September 13, 2016, Kimmons filed a charge of discrimination asserting that Charter denied him a reasonable accommodation by refusing to grant him a shift change. R.43-1. EEOC then brought this enforcement action seeking injunctive relief and compensatory and punitive damages based on Charter's refusal to accommodate Kimmons' night blindness. R.1.

## C.    District Court Decision

The district court granted Charter's motion for summary judgment and denied EEOC's motion for partial summary judgment. R.60 at 1-8 (A-1-8).

Contrary to Charter's argument on summary judgment, the district court assumed "that Kimmons' alleged night blindness could constitute a disability under the ADA." R.60 at 4 (A-4) (citing case law "finding disabilities where plaintiffs with night blindness introduced evidence of

their difficulty seeing while driving"). The district court instead framed "[t]he dispositive question" as "whether the ADA requires an employer to accommodate an employee who can perform his job's essential functions without such accommodation." R.60 at 1 (A-1). In the district court's view, this Court "disclaim[ed] any such requirement" in *Brumfield v. City of Chicago*, 735 F.3d 619 (7th Cir. 2013), by stating that "'an employer need not accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of [his] job.'" R.60 at 1, 5 (A-1, 5) (quoting *Brumfield*, 735 F.3d at 632).

Thus, in the district court's view, the "critical question" under *Brumfield* is whether the employee's disability "impacts his capacity to perform his job's essential functions. If it does not, then the employer has no obligation to accommodate it." R.60 at 5 (A-5). Applying this standard, the court concluded that Kimmons' "case is . . . a dead ringer for *Brumfield*" because, "[a]s there, Kimmons' disability was irrelevant to his ability to perform the essential functions of his job." R.60 at 5 (A-5). According to the district court, "[n]othing in the record suggest[ed] that Kimmons' night blindness hampered him as a retention representative in any way" and Kimmons had "testified that he had no difficulty performing any job functions while working in the Milwaukee call center." R.60 at 5 (A-5). The court thus concluded that "as a matter of law, Charter was not required to accommodate Kimmons." R.60 at 4 (A-4).

The district court did not adopt a bright-line rule that commute-related accommodations are outside the ADA's purview. R.60 at 6 (A-6) ("The issue in this case is not whether the ADA might ever compel an employer to accommodate an employee's commute."). Instead, it acknowledged that "[i]f the commute is an essential job function that the employee could perform if the employer reasonably accommodated his disability, then a failure-to-accommodate claim" could potentially be sustained. R.60 at 6 (A-6). But, according to the district court, because "[n]either party contend[ed] that Kimmons' commute was an essential function of his retention

representative position," Charter had no obligation to accommodate Kimmons, regardless of whether or not the requested accommodation was reasonable. R.60 at 6-7 (A-6-7). As a result, the district court did not reach the issue of whether Kimmons' requested accommodation was reasonable. *See* R.60 at 1-8 (A-1-8). Charter did not argue that it was entitled to summary judgment on the basis of undue hardship, R.28 at 1-2 & n.1, and the district court did not consider this issue either, *see* R.60 at 1-8 (A-1-8). Accordingly, the district court's grant of summary judgment rested solely on its conclusion that Kimmons' disability was irrelevant to the performance of essential job functions under *Brumfield*. R.60 at 1, 4-5 (A-1, 4-5).

## SUMMARY OF THE ARGUMENT

James Kimmons experiences cataract-related night blindness and asked Charter for a simple shift accommodation to enable him to drive safely home from work. Although Charter initially accommodated Kimmons, it then refused to extend the accommodation for another thirty days. Charter, however, pointed to no undue hardship that would result from this extension nor did it identify any basis for determining the request to be unreasonable. Instead, Charter claimed that the ADA imposes no obligation at all on employers to provide any accommodation related in any way to an employee's commute.

The text and legislative history of the ADA, as well as the case law of this Court and other circuits, all recognize however that an employer must, barring undue hardship, provide accommodations that allow disabled individuals to readily access the workplace, which includes traveling safely to and from the workplace so that they can perform their job. The district court nonetheless rejected the failure-to-accommodate claim here, concluding that Kimmons' disability was not relevant to the performance of essential job functions and thus could not satisfy this Court's decision in *Brumfield*. This was error.

*Brumfield* forecloses failure-to-accommodate claims only when the employee's disability is completely irrelevant to the performance of essential job functions. Kimmons' disability cannot be characterized in this manner. Far from being irrelevant to the performance of essential job functions, Kimmons' night blindness prevented him from driving safely home after his assigned shift from the very location where Charter required that his job duties be carried out. Kimmons' ability to safely access his work site is plainly a necessary prerequisite to the performance of his essential job functions.

If this Court reads *Brumfield* as foreclosing even accommodations necessary to ensure safe access to the workplace, then this Court should revisit *Brumfield* pursuant to Circuit Rule 40(e). *See* 7th Cir. R. 40(e) (permitting a panel to "overrule a prior [circuit] decision" so long as the panel's decision "is first circulated among the active members of [the] court and a majority of them do not vote" for rehearing en banc). The text of the ADA, EEOC regulations, this Court's precedent, and a considerable body of decisions from other circuits confirm that the ADA requires reasonable accommodations beyond those strictly necessary for the performance of essential job functions.

## STANDARD OF REVIEW

This Court reviews de novo a district court's order granting summary judgment. *Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, 600 F.3d 878, 882 (7th Cir. 2010). This Court "draw[s] all inferences in the light most favorable to . . . the nonmoving party" (here, EEOC) and "will affirm only if [it] find[s] that there is no genuine issue as to any material fact" and that the movant "is entitled to judgment as a matter of law." *Id.*

**ARGUMENT**

### A. Kimmons' disability is relevant to the performance of essential job functions as required by *Brumfield* because it prevented him from driving safely home from his work site following his assigned shift.

The ADA requires employers to make reasonable accommodations for employees with disabilities, including those accommodations needed to make the workplace "readily accessible" to such employees. 42 U.S.C. §§ 12111(9)(A), 12112(b)(5)(A). Kimmons sought such an accommodation, but Charter denied it without any specific suggestion that his request was unreasonable or imposed an undue hardship.

The district court sanctioned Charter's refusal to accommodate Kimmons, relying entirely on this Court's holding in *Brumfield*. But the district court's reading of *Brumfield*—and the court's application of *Brumfield* to the facts of Kimmons' case—was error. *Brumfield* forecloses failure-to-accommodate claims only when the employee's "disability . . . is *irrelevant* to [the] employee's ability to perform the essential functions of her job."[2] 735 F.3d at 632 (emphasis added). *Brumfield* presented such a case because, there, *no connection* existed between the plaintiff's disability and her essential job functions. Four separate psychological evaluations deemed the plaintiff—a police officer who suffered from "unspecified 'psychological problems'"—"fit for duty," *id.* at 622, 633, and the plaintiff did not identify any accommodation that would have helped her job performance in any way, *see* Docket, *Brumfield v. City of Chi.*, 10-cv-4960 (N.D. Ill.), ECF No. 13 at ¶ 10 (referring generally to the employer's failure to "take any action to accommodate plaintiff's disability" without specifying what accommodation plaintiff requested or desired). This Court therefore emphasized that "nothing in [the plaintiff's] complaint suggest[ed] that her disability affected her ability to do any aspect of her job." 735 F.3d at 633. *Brumfield* thus stands for the narrow proposition that "the ADA

---

[2] *Brumfield* addressed a claim brought under the Rehabilitation Act but applied the standards governing ADA claims. 735 F.3d at 630 (recognizing that the Rehabilitation Act generally "incorporates the standards applicable to Title I of the ADA").

does not require an employer to accommodate disabilities that have *no bearing on* an employee's

ability to perform the essential functions of her job." *Id.* (emphasis added); *see also Luckett v. Dart*,

No. 14-CV-6089, 2017 WL 3386117, at *11, 14 (N.D. Ill. Aug. 7, 2017) (reading *Brumfield* to bar

accommodation claims only where the employee's disability is "*irrelevant* to his ability to perform his

job" or "lacks a causal connection with the accommodation he seeks").

    This Court has cited *Brumfield*'s holding regarding essential job functions only once, in a case

that shared with *Brumfield* a similarly attenuated connection between the plaintiff's disability and his

ability to perform his basic job duties. In *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846 (7th Cir.

2015), this Court found the plaintiff's failure-to-accommodate claim waived because his complaint

failed to identify any "purported need or request for accommodations." *Id.* at 852. This Court

nevertheless went on to say that such a claim would fail based on *Brumfield*. *Id.* But in *Hooper*, as in

*Brumfield*, the plaintiff's disability was irrelevant to his ability to perform essential job functions

because his doctor had "cleared [him] to return to work without accommodations." *Id. Hooper*, like

*Brumfield*, thus bars accommodation claims only where "'the employee's limitations do not affect her

ability to perform [her] essential [job] functions'" in any way. *Id.* (quoting *Brumfield*, 735 F.3d at 633).

    Neither *Hooper* nor *Brumfield* addressed a situation like Kimmons' where the disability at issue

impacted the employee's ability to travel safely to and from the very location where his job duties

were performed. Here, two medical professionals explained that Kimmons' cataracts impaired his

night vision and interfered with his ability to drive at night. Kimmons' optometrist explained that

cataracts cause diminished visual acuity that is particularly acute in the dark and recommended that

Kimmons avoid night driving. R.30-55 at 75:12-14; R.30-59 at 4. And Kimmons' primary care

physician similarly noted that Kimmons' cataracts "impair[ed] his night vision" and caused

"difficulty driving after dark." R.30-21 at 3. Kimmons, too, testified that the "glaring . . . of

oncoming traffic lights" interfered with his night vision and caused him to avoid night driving

entirely. R.30-5 at 30:10-12, 46:2-14. Yet, Charter assigned Kimmons a shift that ended after

nightfall. In such a situation, there can be no plausible claim that the disability "is irrelevant to" or

has "no bearing on" the performance of essential job functions. *Brumfield*, 735 F.3d at 632, 633.

Instead, it is plain that Kimmons could not perform the essential functions of his job if he could not

access the very location where Charter required him to carry out his job duties.

The district court did not appear to question the factual premise that Kimmons' disability

impacted his ability to get home safely from work following his assigned shift and that he requested

an accommodation to overcome this barrier. *See* R.60 at 2 (A-2) (noting Kimmons' testimony that

his "cataracts made driving at night difficult because they caused outside light to glare and obstruct

his vision"); R.60 at 4 (A-4) (noting that the parties "agree that Kimmons requested an

accommodation based on" his cataracts); R.60 at 4 (A-4) (assuming that Kimmons' night blindness

could constitute a disability). Instead, the district court arrived at the conclusion that "Kimmons'

disability was irrelevant to his ability to perform the essential functions of his job," R.60 at 5 (A-5),

only by focusing myopically on whether Kimmons' *commute itself* was an essential job function. The

district court appeared to conclude that, because Kimmons' commute was not itself "an essential

function of his retention representative position," his requested accommodation by definition

related to "convenience" rather than "[job] performance." R.60 at 5, 7 (A-5, 7). But this formalistic

application of *Brumfield* in the context of accommodations needed to get to and from the workplace

is at odds with the text and legislative history of the ADA, the case law of this Court and other

circuits, and the core purposes the ADA seeks to fulfill.

First, the text and legislative history of the ADA make clear that the statute embraces

accommodations aimed at allowing disabled individuals to access the workplace to perform their

essential job functions. After all, if employees cannot access the location where their employers

require them to work, they cannot work at all. The statute thus specifically envisions

14

accommodations that promote workplace accessibility, stating that the term "reasonable accommodation" may include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12111(9)(A); *see also* 29 C.F.R. § 1630.2(o)(2)(i) (same). Second, the text of the ADA contemplates the exact type of accommodation Kimmons sought—namely, a modified work schedule—and the legislative history confirms that Congress intended this accommodation to be available to individuals reliant on public transportation due to mobility impairments. 42 U.S.C. § 12111(9)(B) (providing that reasonable accommodations "may include . . . modified work schedules"); H.R. Rep. No. 101-485, pt. 2, at 62-63 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 330, 345 (acknowledging that "modified work schedules can provide useful accommodations" and that "persons who may require modified work schedules are persons with mobility impairments who depend on a public transportation system that is not currently fully accessible").

Consistent with these principles, several courts of appeals have held that the ADA requires reasonable accommodations necessary for disabled employees to get to and from the workplace, recognizing the inherent link between such accommodations and performance of essential job functions. In *Colwell v. Rite Aid Corp.*, 602 F.3d 495 (3d Cir. 2010), just as here, an employee sought a change in her work schedule from night to day shifts because her vision impairment made it "dangerous and difficult" for her to drive to and from work at night. *Id.* at 498. Relying on the ADA's text and legislative history, the Third Circuit held that "the ADA contemplates that employers may need to make reasonable shift changes in order to accommodate a disabled employee's disability-related difficulties in getting to work" and rejected the notion that the ADA "strictly limit[s] the breadth of reasonable accommodations to address only those problems that an employee has in performing her work that arise once she arrives at the workplace." *Id.* at 505-06. In reaching this conclusion, the Third Circuit found "perplexing" the district court's claim that the

requested accommodation "had nothing to do with the work environment or the manner and circumstances under which [Colwell] performed her work," emphasizing that "Colwell was certainly required to be at work to perform any of the functions of her job" as a cashier. *Id.* at 506 (citation omitted, alterations in original); *see also Livingston v. Fred Meyer Stores, Inc.*, 388 F. App'x 738, 740-41 (9th Cir. 2010) (where employee requested modified work schedule due to vision impairment impacting night driving, concluding that employer had a duty to accommodate employee's "limitations in getting to and from work" even though "her disability did not affect her ability to function effectively as a wine steward" once at the workplace).

Similarly, in *Lyons v. Legal Aid Society*, 68 F.3d 1512 (2d Cir. 1995), an employee requested financial assistance to pay for a parking space adjacent to her office so that she could access the workplace despite her mobility limitations. *Id.* at 1513. The Second Circuit held that "there is nothing inherently unreasonable . . . in requiring an employer to furnish an otherwise qualified disabled employee with assistance related to her ability to get to work." *Id.* at 1517. The court explained that "[i]t is clear that an essential aspect of many jobs is the ability to appear at work regularly and on time . . . and that Congress envisioned that employer assistance with transportation to get the employee to and from the job might be covered." *Id.* at 1516. The court thus disagreed that Lyons' requested accommodation was "unrelated to the 'essential functions' of her job" or akin to "a demand for an additional fringe benefit in the nature of a 'personal amenity,'" explaining that "Lyons's ability to reach her office" was instead "an essential prerequisite to her work in that position." *Id.* at 1517; *see also Feist v. La. Dep't of Just.*, 730 F.3d 450, 453 (5th Cir. 2013) (concluding that on-site parking for employee with mobility limitations could be a reasonable accommodation needed to make the workplace "readily accessible to" the employee pursuant to 42 U.S.C. § 12111(9)(A), regardless of whether "the parking situation limited her ability to perform the essential functions of her job" (internal quotation marks omitted)).

16

Finally, in *Burnett v. Ocean Properties, Ltd.*, 987 F.3d 57 (1st Cir. 2021), the First Circuit affirmed a jury's finding that installation of push-button doors to allow a paraplegic employee to get his wheelchair through his office building's heavy wooden doors constituted a reasonable accommodation, concluding that the employee's ability to perform his job functions once inside the office did not relieve the employer of its duty to facilitate access to the office in the first instance. *Id.* at 61, 69. These decisions thus reflect the straightforward principle—overlooked by the district court here—that employees' ability to get to and from the location where they carry out their essential job functions is a necessary prerequisite to performing those functions.

This Court, too, has recognized this inherent link between being present at the workplace—where, as here, an employee cannot perform the job remotely[3]—and performing essential job functions. *See, e.g., Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899-900 (7th Cir. 2000) ("[c]ommon sense dictates" that if an employee "is not present" at the workplace, "he is usually unable to perform his job"); *Waggoner v. Olin Corp.*, 169 F.3d 481, 485 (7th Cir. 1999) (except "where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform *any* of his job functions, essential or otherwise" (internal quotation marks and citations omitted)).

In keeping with this principle, this Court has made clear that the ADA requires accommodations necessary for disabled employees to access the workplace to perform their essential job functions. And this Court has rejected the notion that an employee's ability to perform essential job functions *once at the workplace* relieves an employer of its obligation to provide accommodations allowing the employee to *access the workplace* in the first instance. In *Filar v. Board of Education of City of Chicago*, 526 F.3d 1054 (7th Cir. 2008)—which predated *Brumfield*—a substitute

---

[3] Technological advances have made it possible for many jobs to be performed remotely, but in this case Charter never suggested that Kimmons could have performed his essential duties from home.

teacher requested that she be assigned only to schools that were easily accessible from bus stops because of her mobility limitations. *Id.* at 1059. The district court dismissed the claim on the basis that the employee's "proximity to public transportation d[id] not affect the way in which she teaches Polish in her capacity as a substitute teacher." *Id.* at 1066 (citation omitted). This Court disagreed with the district court's conclusion that "[t]he fact that Filar's hip condition did not affect her ability to teach" should "end the matter." *Id.* at 1067. Instead, this Court explained, the ADA imposes a duty on employers to "'mak[e] existing facilities used by employees readily accessible to and usable by individuals with disabilities,'" and Filar could still be eligible for such an accommodation despite her ability to perform her essential job functions once at the workplace as long as that accommodation was reasonable. *Id.* (quoting 42 U.S.C. § 12111(9)(A)); *see also id.* at 1067-68 (finding requested accommodation unreasonable due to unrelated concerns like administrative burden). Similarly, in *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005), this Court concluded that § 12111(9)(A) obligated the employer to make its facility accessible to an employee with mobility limitations who requested to park closer to the store where she worked and to take a short cut through the store to her workstation, even though the parties agreed that the employee "was able to perform all of the aspects of her job but simply had trouble getting to and from her workstation." *Id.* at 802-03. These decisions thus make clear that the ADA requires accommodations necessary for disabled employees to access the workplace, even where those employees can perform all essential functions without accommodation once at the workplace.

This Court's commute-related decisions are also at odds with the district court's insistence here that Kimmons' *commute itself* be an essential job function. Instead, this Court has analyzed the reasonableness of commute-related accommodations without even considering whether the commute itself constituted an essential job function, much less imposing a requirement to that effect as the district court did here. *See Yochim v. Carson*, 935 F.3d 586, 591-92 (7th Cir. 2019) (evaluating

reasonableness of employer's response to telework request to accommodate employee's mobility limitations that impeded public transportation access with no suggestion that public transportation use must itself be essential job function); *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176-79 (7th Cir. 2013) (evaluating reasonableness of employer's response to request for parking space near office to accommodate employee's mobility limitations without suggesting that parking itself must be essential job function), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016); *see also Gile v. United Airlines, Inc.*, 213 F.3d 365, 372-73 (7th Cir. 2000) (upholding jury verdict finding that employer violated ADA by denying change to day shift in order to alleviate employee's insomnia that impeded job performance while at work); *Colwell*, 602 F.3d at 505 n.8 (citing *Gile* for the proposition that this Court has "at least assumed the existence of . . . an obligation" to "accommodate a disability-related problem outside of the workplace that influences an employee's ability to perform the essential functions of her job while at work").

District courts within this Circuit have also eschewed a narrow focus on whether an employee's commute itself constitutes an essential job function, instead acknowledging that the commute is typically a necessary prerequisite to the performance of basic job duties. *See Fuller v. Belleville Area Cmty. Coll. Dist. No. 522*, No. 3:18-cv-01123-GCS, 2020 WL 1287743, at *7 (S.D. Ill. Mar. 18, 2020) (rejecting employer's reliance on *Brumfield* where employee requested to work at closer worksite due to cataract-related driving difficulties, explaining that if the employee "cannot get to her work location, she cannot perform her job's essential functions"); *Hendon v. Wis. Bell, Inc.*, No. 16-C-0941, 2018 WL 1885678, at *3 (E.D. Wis. Apr. 19, 2018) (finding unconvincing the argument that employee's disability-related driving limitations "did not affect her ability to perform the essential functions of her job" but instead "affected only her ability to *commute* to her job," given that "an employer is not excused from providing an otherwise reasonable accommodation to an

employee simply because it relates to the employee's ability to get to and from work rather than his or her ability to perform while at work").

    *Brumfield* did not express any disagreement with this Court's prior precedent, much less indicate an intent to overrule this precedent through use of Circuit Rule 40(e).[4] Because "[o]verruling [established precedent] requires recognition of the decision to be undone and circulation to the full court under Circuit Rule 40(e)," *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002), *Brumfield* should not be interpreted, as the district court did here, in a manner that conflicts with this Court's decisions recognizing that the ADA requires accommodations necessary for a disabled employee to *access the workplace* even where the employee can perform all essential job functions *once at the workplace. See United States v. Polichemi*, 201 F.3d 858, 865 (7th Cir. 2000) (reading later panel decision in a manner that avoided conflict with a prior panel decision because later decision "did not purport to overrule" the prior decision and could not "have done so . . . without undergoing circulation to the full court under the procedures established in Circuit Rule 40(e)"), *vacated in part on other grounds on reh'g*, 219 F.3d 698 (7th Cir. 2000).

    The district court's rigid application of *Brumfield* in the context of accommodations needed to make the workplace "readily accessible" under § 12111(9)(A) would lead to untenable results if allowed to stand, foreclosing even the most fundamental accommodations necessary to promote

---

    [4] It is true, as the district court pointed out, R.60 at 6 (A-6), that *Brumfield* stated that "[t]he *Sears* formulation should not be understood to enable a plaintiff to state a failure-to-accommodate claim against her employer even though she was able to perform all essential functions of her job without regard to her physical or mental limitations." 735 F.3d at 631-32. But *Brumfield*'s reference to "[t]he *Sears* formulation" concerned only the "elements of a failure-to-accommodate claim" articulated in *Sears. Id.* at 631. *Brumfield* explained that *Sears*' formulation of the first element of a failure-to-accommodate claim—namely, that "plaintiff must be a qualified individual with a disability"—contained a "certain imprecision" because it did not make clear that only those individuals who required an accommodation to perform their essential job functions were eligible to receive an accommodation. *Id.* However, *Brumfield* nowhere disputed *Sears*' holding that an employee who required an accommodation to access the workplace was eligible for an accommodation despite the fact that she could "perform all of the aspects of her job" without any accommodation once inside the workplace. *Sears*, 417 F.3d at 802.

workplace accessibility. For example, under the district court's logic, an employee who required modification to his office doors in order to enter the workplace would have no entitlement to such an accommodation unless *use of the doors itself* constituted an essential job function. But the case law imposes no such requirement. *See, e.g.*, *Burnett*, 987 F.3d at 69 (affirming jury verdict that ADA required accommodation to allow wheelchair-bound employee to enter office doors despite employee's ability to perform job duties once inside the workplace); *EEOC v. Kaiser Found. Health Plan of Ga., Inc.*, No. 19-CV-5484-AT, 2021 WL 3508533, at *5 (N.D. Ga. Aug. 9, 2021) (ADA required accommodation to allow employee to avoid using revolving office doors that exacerbated her claustrophobia, regardless of whether she had difficulty performing essential job functions once inside the workplace). And the ADA's core objectives of ensuring "equality of opportunity" and "full participation" in the workplace, 42 U.S.C. § 12101(a)(7), do not countenance a result that would leave disabled employees stranded outside their workplace doors.

Thus, the text and legislative history of the ADA, the decisions of this Court and other circuits, and the ADA's core purposes all establish that employers must provide accommodations that allow disabled employees to readily access the location where their essential job functions are performed. This obligation exists even where the disabled employee in question manages to access the workplace without an accommodation but does so only with great difficulty. *See, e.g.*, *Colwell*, 602 F.3d at 499, 505-06 (employee with vision impairment that made night driving dangerous could be entitled to shift-change accommodation where she "assert[ed] that shuttling her to and from work for night shifts created a hardship for her family," even though she "did not miss a day of work because of her vision loss except for medical treatment"); *Lyons*, 68 F.3d at 1514, 1517 (employee stated failure-to-accommodate claim by alleging that employer failed to pay for nearby parking space to allow her to access workplace despite mobility limitations, even though employee was able to attend work without accommodation by paying for her own parking space); *Fuller*, 2020 WL

1287743, at *7 (rejecting argument that employee who requested to work at closer worksite due to cataract-related driving difficulties required "no reasonable accommodation because she continues to work at the [more distant] office without a reasonable accommodation," emphasizing that employee had "found [only] a temporary solution" that appeared to "no longer [be] available or . . . sustainable"). Kimmons need not show that "it was physically impossible" to get to and from the workplace "before defendant was obligated to provide [him] with an accommodation." *Sturz v. Wis. Dep't of Corr.*, 642 F. Supp. 2d 881, 888 (W.D. Wis. 2009) (rejecting this as a "disturbing standard for determining whether an accommodation is reasonable"). It thus poses no bar to the failure-to-accommodate claim here that, after Charter denied his accommodation request, Kimmons managed to get home from work at night by depending on friends who were often unreliable or exasperated by his requests. R.30-5 at 67:25-68:5, 150:1-9. The district court thus erred by holding that Charter had no obligation to provide any accommodation to Kimmons to enable him to drive safely home from the workplace following his assigned shift.

### B. If necessary, this Court should revisit *Brumfield* pursuant to Circuit Rule 40(e) to hold that reasonable accommodations may be required even if unrelated to the performance of essential job functions.

If this Court concludes that *Brumfield* forecloses even those accommodations necessary to allow safe access to the workplace, then this Court should revisit *Brumfield* pursuant to Circuit Rule 40(e). The text of the ADA, EEOC regulations, this Court's prior precedent, and a considerable body of decisions from other circuits all indicate that the ADA's reasonable accommodation mandate extends beyond performance of essential job functions.

### 1. The text of the ADA makes clear that reasonable accommodations may be required even when an employee can perform essential job functions without them.

The text of the ADA's reasonable accommodation provision "gives no indication that an accommodation must facilitate the essential functions of one's position." *Feist*, 730 F.3d at 453; *see*

42 U.S.C. § 12112(b)(5)(A) (prohibiting "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," absent undue hardship). The statute gives several examples of what may constitute a "reasonable accommodation" but nowhere limits the definition to only those accommodations required for performance of essential job functions. *Id.* § 12111(9). While it is true that the ADA contemplates accommodations that allow an individual to "perform the essential functions of [an] employment position," *id.* § 12111(8), the ADA's concerns extend more broadly to other goals, such as making the workplace "readily accessible" to disabled employees, *id.* § 12111(9)(A), and ensuring equal benefits, privileges, and opportunities in the workplace, *see id.* § 12112(a) (prohibiting discrimination in "advancement, . . . job training, and other terms, conditions, and privileges of employment"); *id.* § 12112(b)(1) (prohibiting limiting or segregating individuals because of disability); *id.* § 12101(a)(5) (expressing concern that "individuals with disabilities continually encounter various forms of discrimination, including . . . relegation to lesser services, programs, activities, benefits, jobs, or other opportunities").

Moreover, the statute defines the term "qualified individual" to include those who can perform essential job functions "*without* reasonable accommodation." *Id.* § 12111(8) (emphasis added). The fact that the statute protects such individuals from "discriminat[ion] . . . on the basis of disability," *id.* § 12112(a), and specifically defines such discrimination as including the failure to "mak[e] reasonable accommodations," *id.* § 12112(b)(5)(A), forecloses any argument that individuals who can perform essential job functions without an accommodation are ineligible to receive one. Indeed, prior to *Brumfield*, this Court relied on this statutory language to reach precisely this conclusion. In *Filar*, this Court explained that because the ADA defines the term "qualified individual" as an individual "'who, *with or without reasonable accommodation*, can perform the essential functions of the employment position,'" an employee's ability to "'perform the essential functions'

23

of [her] . . . position despite her disability and 'without reasonable accommodation'" does not

prevent her from bringing a failure-to-accommodate claim. 526 F.3d at 1067 (quoting 42

U.S.C. § 12111(8)). Thus, this Court reasoned, it would run counter to the textual definition of a

"qualified individual" to require the plaintiff to show as a prerequisite to sustaining a failure-to-

accommodate claim that she was unable to perform the essential functions of her teaching position

without an accommodation. *Id.*

　　　Other courts have also relied on the statutory definition of a "qualified individual" to reach

this same conclusion. In *Bell v. O'Reilly Auto Enterprises, LLC*, 972 F.3d 21 (1st Cir. 2020), *cert. denied*,

141 S. Ct. 2755 (2021), the First Circuit held that "[t]he district court erred . . . when it instructed the

jury that, for a disabled employee to make out a failure-to-accommodate claim, he must demonstrate

that he *needed* an accommodation to perform the essential functions of his job." *Id.* at 24. In the First

Circuit's view, by defining a "qualified individual" as one who could perform the essential functions

of the employment position "'with *or without reasonable accommodation*,'" the ADA made clear that "[a]n

employee who can . . . perform the essential functions of his job without accommodation remains

eligible to request and receive a reasonable accommodation." *Id.* (quoting 42 U.S.C. § 12111(8)).

Multiple district courts have also drawn the same conclusion from this statutory language. *See, e.g.*,

*Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 366 (E.D.N.Y. 2012) (reading this statutory

language as indicating that "the requested accommodations d[o] not necessarily have to go to

essential functions of the job"); *EEOC v. Life Techs. Corp.*, No. WMN-09-2569, 2010 WL 4449365, at

*5 (D. Md. Nov. 4, 2010) ("Implicit in th[e] definition" of a "qualified individual" is "the expectation

that some accommodations are provided to do more than just permit the qualified individual with a

disability to perform the essential functions of the position.").

　　　This Court acknowledged in *Brumfield* that the statutory definition of a "qualified individual"

includes those who can perform essential job functions even without an accommodation but

emphasized that the ADA's reasonable accommodation requirement applies only to "*otherwise* qualified individuals." 735 F.3d at 632; *see also* 42 U.S.C. § 12112(b)(5)(A) (prohibiting "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability"). Thus, *Brumfield* reasoned, while "the ADA's other anti-discrimination provisions protect *all* qualified individuals, the reasonable-accommodation requirement applies only to the known physical or mental limitations of *otherwise* qualified individuals." 735 F.3d at 632. And the term "otherwise qualified individual," according to *Brumfield*, refers to those individuals who are qualified "on paper" but cannot perform the essential functions of their job without an accommodation. *Id.* This is because, in *Brumfield*'s view, individuals who are both qualified on paper and able to perform essential job functions without an accommodation are "qualified for the position in *every* relevant respect" and thus cannot be said to be "'*otherwise* qualified.'" *Id.* (quoting 42 U.S.C. § 12112(b)(5)(A)).

There is no textual support, however, for reading the term "otherwise qualified individual" in this manner. As noted above, *supra* at 23, Congress expressly protected individuals who can perform essential job functions "without accommodation" from "discriminat[ion] . . . on the basis of disability," 42 U.S.C. §§ 12111(8), 12112(a), and defined such discrimination as including the failure to provide reasonable accommodations, *id.* § 12112(b)(5)(A). It defies logic to think that Congress's addition of the undefined term "otherwise" in § 12112(b)(5)(A) actually signaled a contrary intent to exclude such individuals from the statute's reasonable accommodation protections. To the contrary, Congress can be expected to "speak clearly" before it "includes exceptions in statutes that serve to undermine broader statutory purposes." *Cal. Dep't of Toxic Substances Control v. Westside Delivery, LLC*, 888 F.3d 1085, 1098 (9th Cir. 2018). Indeed, we are aware of no other circuit that has followed *Brumfield* in concluding that Congress intended such a drastic departure from the ADA's core purposes when it used the word "otherwise" in § 12112(b)(5)(A).

Nor is *Brumfield*'s reading of the term "otherwise" necessary to avoid rendering that term superfluous. Congress's use of a particular phrase is not "superfluous if Congress included it to remove doubt" as to a particular element of the statute. *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013). And, here, as EEOC's interpretive guidance explains,[5] Congress's use of the term "otherwise qualified" in § 12112(b)(5) was simply "intended to make clear that the obligation to make reasonable accommodation is owed only to an individual with a disability who is qualified within the meaning of [29 C.F.R.] § 1630.2(m) in that he or she satisfies all the skill, experience, education, and other job-related selection criteria." 29 C.F.R. pt. 1630, app. § 1630.9; *see* 29 C.F.R. § 1630.2(m) (requiring that individuals satisfy "the requisite skill, experience, education, and other job-related requirements of the employment position" to be "qualified"). For example, "if a law firm requires that all incoming lawyers have graduated from an accredited law school and have passed the bar examination," an "individual with a visual impairment who has not met these selection criteria" would not be "'otherwise qualified' for the position" and would not be "entitled to a reasonable accommodation." 29 C.F.R. pt. 1630, app. § 1630.9. In other words, Congress used the term "otherwise qualified" simply to "remove doubt," *Marx*, 568 U.S. at 385, that an employer might have to accommodate an individual who patently lacked the minimum qualifications for the job.

To say that an individual is "otherwise qualified," then, means that the individual meets the statutory definition of a "qualified individual" (*i.e.*, can perform the essential functions of the job either with or without a reasonable accommodation), and also "otherwise" meets the employer's job-related selection criteria. *See, e.g., Bay v. Cassens Transp. Co.*, 212 F.3d 969, 975-76 (7th Cir. 2000) ("We therefore find that [plaintiff] was not 'otherwise qualified' under the ADA because he lacked

---

[5] Although EEOC interpretive guidance is "not entitled to full . . . deference" under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), "it does reflect a body of experience and informed judgment to which courts and litigants may properly resort for guidance" that is entitled to deference under the "*Skidmore* [*v. Swift & Co.*, 323 U.S. 134 (1944)] standard." *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 889 (7th Cir. 2019) (internal quotation marks and citations omitted) (alterations in original).

the necessary DOT certification" required for the position.); *Johnson v. Bd. of Trs. of Boundary Cnty. Sch. Dist. No. 101,* 666 F.3d 561, 565-66 (9th Cir. 2011) ("[U]nless a disabled individual independently satisfies the job prerequisites, she is not 'otherwise qualified,' and the employer is not obligated to furnish any reasonable accommodation . . . ."); *Wilkerson v. Shinseki*, 606 F.3d 1256, 1263 (10th Cir. 2010) (individual was not "otherwise qualified for employment as a boiler room operator" because he "failed to meet the minimum physical requirements of the position") (Rehabilitation Act). Contrary to *Brumfield*'s reasoning, then, an individual who is already able to perform the essential functions of the job without an accommodation would not necessarily be "qualified for the position in *every* relevant respect," 735 F.3d at 632, because that individual could lack the requisite skills, education, or experience to satisfy the employer's selection criteria. Borrowing from the example in EEOC's guidance, a lawyer with a vision impairment who required an accommodation to assist him with navigating entry to his office but who could perform his legal duties without this accommodation would not be "qualified for the position in every relevant respect," *id.*, if he lacked required credentials like graduation from an accredited law school. *See* 29 C.F.R. pt. 1630, app. § 1630.9.

In cases where there is no dispute about whether an employee meets the minimum selection criteria for the position, there is no meaningful distinction between the term "otherwise qualified individual" in § 12112(b)(5)(A) and the term "qualified individual" in § 12111(8), and indeed courts have understood those terms to be functionally equivalent in that context. *See, e.g., Whitaker v. Wis. Dep't of Health Servs.*, 849 F.3d 681, 684 (7th Cir. 2017) (concluding that "[a]n employee is 'otherwise qualified' when she is capable of performing the 'essential functions' of the job with or without a reasonable accommodation" (citing *Brumfield*, 735 F.3d at 631)); *Watson v. Lithonia Lighting*, 304 F.3d 749, 753 (7th Cir. 2002) ("A person is 'otherwise qualified' within the meaning of the ADA only if she can perform . . . [her job] (with or without an accommodation)."); *Bultemeyer v. Fort Wayne Cmty.*

27

*Schs.*, 100 F.3d 1281, 1284-85 (7th Cir. 1996) (analyzing whether plaintiff was an "otherwise qualified individual" by determining whether he had shown he was a "qualified individual" within the meaning of § 12111(8)); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1258 (11th Cir. 2001) (explaining that the plaintiff "was 'otherwise qualified' for [his] job if he could perform its essential functions with or without reasonable accommodation" (citing 42 U.S.C. § 12111(8)); *Lyons*, 68 F.3d at 1514 ("'[O]therwise qualified' means that the individual, '*with or without reasonable accommodation*, can perform the essential functions of the employment position that such individual holds or desires.'" (quoting 42 U.S.C. § 12111(8)). There is thus no basis to read the term "otherwise qualified individual," as *Brumfield* does, as limited to only those individuals who require an accommodation to allow them to perform the essential functions of their job.

2.  **Assuming, *arguendo*, that the text of the ADA is ambiguous, this Court should defer to EEOC's regulation clarifying that employers must provide accommodations for purposes beyond performance of essential job functions.**

*Brumfield*'s interpretation of the term "otherwise qualified individual" also conflicts with EEOC's regulation at 29 C.F.R. § 1630.2(o)(1), which makes clear that the ADA requires accommodations beyond those necessary for performance of essential job functions. *Brumfield* asserted that this regulation "defines 'reasonable accommodation' to refer to workplace adjustments 'that enable an individual with a disability who is qualified to perform the essential functions of that position,'" but this selectively quotes the relevant regulation. 735 F.3d at 633 (quoting 29 C.F.R. § 1630.2(o)(1)(ii)). While subsection (ii) of the regulation, which *Brumfield* cited, refers to accommodations that enable an employee "to perform the essential functions" of a position, subsections (i) and (iii) contemplate accommodations needed to allow an individual to "be considered for . . . [a desired] position" or to "enjoy equal benefits and privileges of employment," neither of which necessarily pertain to the performance of essential job functions. 29 CF.R. § 1630.2(o)(1)(i)-(iii). Thus, an accommodation "that enables an individual to perform the essential

functions of a position is only one of three categories of reasonable accommodation" that the regulation contemplates. *Feist*, 730 F.3d at 453; *see also Sanchez v. Vilsack*, 695 F.3d 1174, 1181-82 (10th Cir. 2012) (finding that this regulation "contemplate[s] accommodations that are wholly unrelated to the essential functions of a job" and refusing to "split with [EEOC] . . . by adopting a rule that accommodations are required only if an employee cannot perform the essential functions of her job") (Rehabilitation Act).

This regulation is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because it was "promulgated in the exercise of [the rulemaking] . . . authority" granted to EEOC by Congress in 42 U.S.C. § 12116, *see White v. Scibana*, 390 F.3d 997, 1000 (7th Cir. 2004) (citation omitted), and because it plainly reflects a "permissible construction of the statute," *Chevron*, 467 U.S. at 843; *see also Feist*, 730 F.3d at 453 & n.4 (relying on this regulation and suggesting that it should be entitled to *Chevron* deference); *Life Techs.*, 2010 WL 4449365, at *4 (relying on this regulation for conclusion that employers must provide accommodations beyond those that "minimally permit disabled employees to do their job" and finding that this regulation is entitled to *Chevron* deference). Thus, to the extent that this Court finds the statutory text ambiguous, it should defer to EEOC's regulation that interprets the statute to require accommodations for purposes beyond performance of essential job functions.

### 3. *Brumfield* conflicts with the precedent of this and other courts.

*Brumfield*'s holding conflicts not only with EEOC's regulation at 29 C.F.R. § 1630.2(o)(1) but also with this Court's prior precedent. In *Brumfield*, the employer did not argue that the employee's disability was irrelevant to performance of essential job functions, and thus the parties did not brief this Court's prior precedent regarding this issue. Docket, *Brumfield v. City of Chi.*, 11-3836 (7th Cir.), R.5, R.12. But, as noted above, *supra* at 23-24, this Court in *Filar* had adopted an interpretation of the statutory text that directly contradicts *Brumfield*'s, concluding that disabled employees remain

eligible for an accommodation even when they "can 'perform the essential functions' of . . . [the] position . . . 'without reasonable accommodation.'" 526 F.3d at 1067 (quoting 42 U.S.C. § 12111(8)). And this Court's decisions interpreting the Rehabilitation Act had concluded prior to *Brumfield* that an employer's accommodation duty extends beyond the performance of essential job functions. *Fedro v. Reno*, 21 F.3d 1391, 1395-96 (7th Cir. 1994) (Rehabilitation Act envisions accommodations needed not just for performance of essential job functions but also for purposes such as "pursu[ing] therapy or treatment for [a] handicap" and "enjoy[ing] the privileges and benefits of employment equal to those enjoyed by non-handicapped employees"); *McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir. 1992) ("We also reject the district court's suggestion that McWright's claim was defective because the accommodation she requested was not related to any specific condition of her work. . . . The Rehabilitation Act calls for reasonable accommodations that permit handicapped individuals to lead normal lives, not merely accommodations that facilitate the performance of specific employment tasks." (internal quotation marks and citation omitted)); *see also Sanchez*, 695 F.3d at 1180-81 (citing *Fedro* and *McWright* for the proposition that "[t]he Seventh Circuit has perhaps the most expansive jurisprudence" supporting the notion that an employer's accommodation duty extends beyond performance of essential job functions). Where, as with *Brumfield*, a decision is "inconsistent with the majority of [this Court's] cases," reconsideration pursuant to Circuit Rule 40(e) is appropriate. *Spiegla v. Hull*, 371 F.3d 928, 942 & n.7 (7th Cir. 2004); *see also United States v. Howze*, 343 F.3d 919, 924 (7th Cir. 2003) (invoking Circuit Rule 40(e) where decision at issue was "out of line . . . with how this circuit has analyzed related issues").

Other circuits have also declined to limit the scope of an employer's accommodation duty to the performance of essential job functions, with one circuit specifically rejecting *Brumfield*. *Stokes v. Nielsen*, 751 F. App'x 451, 454 (5th Cir. 2018) (per curiam) (finding district court's reliance on *Brumfield* to be error because "our circuit has explicitly rejected the requirement that requested

modifications must be necessary to perform essential job functions to constitute a reasonable accommodation"); *see also Bell*, 972 F.3d at 24 (holding that an employee who can "perform the essential functions of his job without accommodation remains eligible to request and receive a reasonable accommodation"); *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 239 (D.C. Cir. 2018) (rejecting argument that no accommodation was required where plaintiff "could perform the essential functions of his job without accommodation"); *Feist*, 730 F.3d at 454 (holding that "the district court erred in requiring a nexus between the requested accommodation and the essential functions of [the employee's] position."); *Sanchez*, 695 F.3d at 1182 (refusing to "split with . . . sibling circuits by adopting a rule that accommodations are required only if an employee cannot perform the essential functions of her job"); *Buckingham v. United States*, 998 F.2d 735, 740 (9th Cir. 1993) ("[E]mployers are not relieved of their duty to accommodate when employees are already able to perform the essential functions of their job.") (Rehabilitation Act). The fact that *Brumfield* is "out-of-step with the outcomes reached in the vast majority of cases outside [this] . . . circuit" provides compelling grounds for reconsideration under Circuit Rule 40(e). *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403 & n.12 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008); *see also Howze*, 343 F.3d at 924 ("[A] circuit that stands alone against the considered view of coordinate courts should be willing to rethink.").

Adopting the conclusion that the ADA's reasonable accommodation mandate extends beyond performance of essential job functions does not mean that an employer must grant every request by an individual for a reasonable accommodation. An employer has no obligation to provide an accommodation to an employee who does not have an "actual disability" but is instead only "regarded as" having a disability. 29 C.F.R. § 1630.2(o)(4). Nor must an employer provide "modifications that are primarily for the personal benefit of the individual" or "any amenity or convenience that is not job-related." 29 C.F.R. pt. 1630, app. § 1630.9. An employer also has no

obligation to provide an employee with the specific "accommodation he requests or prefers," *Gile*, 95 F.3d at 499, or to provide an accommodation that would impose undue hardship on the employer, 42 U.S.C. § 12112(b)(5)(A); *see also id.* § 12111(10)(A) (defining undue hardship as "an action requiring significant difficulty or expense"). But none of these concerns are implicated in this case, where Kimmons has an actual disability, where the requested accommodation served the job-related purpose of allowing him to drive safely home from his workplace following his assigned shift, and where the employer neither proposed an alternative accommodation nor raised undue hardship as a basis for entitlement to summary judgment.

Thus, because "[t]he language of the ADA, and all available interpretive authority, indicate" that "reasonable accommodations are not restricted to modifications that enable performance of essential job functions," *Feist*, 730 F.3d at 453, this Court should revisit *Brumfield*'s contrary holding if necessary to sustain the accommodation claim here. This Court should acknowledge that the purpose of a reasonable accommodation extends more broadly to allowing disabled employees to enjoy "the *same* workplace opportunities that those without disabilities automatically enjoy." *US Airways, Inc., v. Barnett*, 535 U.S. 391, 397 (2002); *see also* 29 C.F.R. pt. 1630, app. § 1630.2(o) ("[A]n accommodation is any change . . . that enables an individual with a disability to enjoy equal employment opportunities."). Here, even if this Court finds that Kimmons' ability to travel safely to and from the workplace is not strictly necessary for his performance of essential job functions under a rigid reading of *Brumfield*, his ability to do so certainly enables enjoyment of equal employment opportunities. *See Burnett*, 987 F.3d at 69 (ability to access workplace was necessary for employee "to reach a level playing field as an employee without a disability"); *Kaiser*, 2021 WL 3508533, at *6 (disabled employee's "ability to enter her work facility" was critical to allowing her "equal access" to workplace opportunities enjoyed by "non-disabled employees"). Kimmons' requested

32

accommodation thus falls squarely within the scope of the ADA's reasonable accommodation

mandate.

## CONCLUSION

For the foregoing reasons, the judgment should be reversed.

Respectfully submitted,

CHRISTOPHER LAGE
*Deputy General Counsel*

JENNIFER S. GOLDSTEIN
*Associate General Counsel*

ANNE NOEL OCCHIALINO
*Acting Assistant General Counsel*

/s/ Chelsea C. Sharon
CHELSEA C. SHARON
*Attorney, Appellate Litigation Services*
*Office of General Counsel*
*Equal Employment Opportunity*
*Commission*
*131 M St. NE, Fifth Floor*
*Washington, DC 20507*
*(202) 921-2889*
*chelsea.sharon@eeoc.gov*

April 11, 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure

32(a)(7)(B) and Seventh Circuit Rule 32(c) because it contains 10,865 words, excluding the parts of

the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the

typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and

Seventh Circuit Rule 32(b) because it was prepared using Microsoft Word for Office 365 ProPlus in

Garamond, a proportionally spaced typeface, in 12-point font in the body of the brief and 11-point

font in the footnotes.


/s/ Chelsea C. Sharon
CHELSEA C. SHARON

**CERTIFICATE OF SERVICE**

On April 11, 2022, I filed the foregoing brief with the Clerk of the Court by using the CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Chelsea C. Sharon
CHELSEA C. SHARON

## STATEMENT REGARDING SHORT APPENDIX

Pursuant to Circuit Rule 30(d), I certify that all the materials required by Circuit Rules 30(a) and (b) are included. The materials required by Rule 30(a) are bound with this brief in the section labeled "SHORT APPENDIX." There are no materials that fall under the description of materials required by Rule 30(b) and thus no separate appendix is being filed.


/s/ Chelsea C. Sharon
CHELSEA C. SHARON

ADDENDUM

**42 U.S.C. § 12101.  Findings and purpose**

**(a) Findings**

The Congress finds that –

. . .

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

. . .

(7) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals;

. . .

**(b) Purpose**

It is the purpose of this chapter –

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

. . .

**42 U.S.C. § 12111.  Definitions**

. . .

**(8) Qualified individual**

The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.  For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for a job, this description shall be considered evidence of the essential functions of the job.

**(9) Reasonable accommodation**

The term "reasonable accommodation" may include—

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

. . .

**42 U.S.C. § 12112.  Discrimination**

**(a) General Rule**

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

**(b) Construction**

As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes –

**(1)** limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

**(2)** participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs);

**(3)** utilizing standards, criteria, or methods of administration --

    **(A)** that have the effect of discrimination on the basis of disability; or

    **(B)** that perpetuate the discrimination of others who are subject to common administrative control;

**(4)** excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;

**(5)**

    **(A)** not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

    **(B)** denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

**(6)** using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity; and

**(7)** failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than

reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

**29 C.F.R. § 1630.2. Definitions.**

. . .

**(m)** The term "qualified," with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position. See § 1630.3 for exceptions to this definition.

. . .

**(o) Reasonable accommodation.**

(1) The term reasonable accommodation means:

(i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

. . .

**SHORT APPENDIX**

## SHORT APPENDIX: TABLE OF CONTENTS

Opinion and Order, R.60 (Dec. 17, 2021)................................................................. A-1

Judgment, R. 61 (Dec. 17, 2021)............................................................................ A-9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

        Plaintiff,

                                Case No. 18-cv-1333-bhl

    v.

CHARTER COMMUNICATIONS LLC,

        Defendant.

## ORDER GRANTING SUMMARY JUDGMENT

        In this case, the Equal Employment Opportunity Commission (EEOC) brings a failure-to-accommodate claim under Title I of the Americans with Disabilities Act (ADA) on behalf of James Kimmons against his former employer, Charter Communications LLC (Charter). Both parties have moved for summary judgment. The dispositive question is whether the ADA requires an employer to accommodate an employee who can perform his job's essential functions without such accommodation. Seventh Circuit precedent disclaims any such requirement. Accordingly, the Court will grant Defendant's motion, and Plaintiff's motion will be denied.

### FACTUAL BACKGROUND[1]

        Charter is a telecommunications and media company that operates a call center in Milwaukee, Wisconsin. (ECF No. 37 at 2.) Between 2016 and 2017, the call center was open seven days a week, from 7:00 a.m. to 9:00 p.m., and employed, among other workers, "retention representatives." (*Id.* at 3.) Charter's "ADA – Job Description and Essential Functions" form states that the purpose of a retention representative "is to provide customer retention sales support for all TWC products in a manner consistent with Time Warner Cable policies, procedures, quality, standards, customer needs and applicable local, state, and federal procedures." (*Id.* at 3-4.)[2]

---

[1] These facts are drawn from the parties' proposed statements of undisputed facts (and responses). (ECF Nos. 29, 33, 37, 38, 41, 42, 46 & 49.) Disputed facts are viewed in the light most favorable to the nonmoving party.

[2] Time Warner Cable originally operated the Milwaukee call center. (ECF No. 29 at 1, n. 1.) Charter acquired Time Warner Cable in May 2016. (*Id.*) For the purposes of this order, the distinction between Time Warner Cable and Charter is immaterial.

Charter's Director of Human Resources, Pamela Brown, helpfully strips away the layers of corporate jargon and explains that retention representatives "answer the calls that come in [to Charter]," with an eye toward "retain[ing] existing customers" and attempting "to upgrade [those customers] to services they do not have." (*Id.* at 4.) Full-time retention representatives work nine-hour shifts (including a one-hour break for lunch), beginning every hour, on the hour, between 7:00 a.m. and 12:00 p.m., five days per week. (*Id.*)

In 2016, James Kimmons, a resident of Racine, Wisconsin, who lived about 36 miles (or an approximately one-hour drive) from the Milwaukee call center, applied to work there as a retention representative. (*Id.* at 2, 11-12.) Following both a telephone screening and face-to-face interview, Charter hired Kimmons, and his employment commenced on March 4, 2016. (*Id.* at 12-14.) From that date until April 10, 2016, he underwent training from 8:00 a.m. to 5:00 p.m., Monday through Friday. (*Id.* at 14-15.) Kimmons' training continued from April 11, 2016 to July 7, 2016 from 10:00 a.m. to 7:00 p.m., Monday through Friday. (*Id.* at 15.) Near the end of the training period, Kimmons and the other individuals in his new hire class attended a shift-selection meeting. (*Id.* at 15-16.) At the meeting, Kimmons selected the 12:00 p.m. to 9:00 p.m. shift because it "was the only shift that was left." (*Id.* at 16.) Charter expected Kimmons to work this shift for at least 6 to 12 months, until the next "shift bid." (*See id.* at 9.)

According to Dr. Bruce Savin, as of 2016, Kimmons had "early cataracts." (ECF No. 41 at 2.) Kimmons testified that these cataracts made driving at night difficult because they caused outside light to glare and obstruct his vision. (*Id.* at 3.) Accordingly, he submitted an "ADA – Employee Accommodation Request Form" requesting a shift that would allow him to avoid driving to or from work in the dark. (ECF No. 37 at 17-18.) In support of his application, Kimmons submitted two "ADA – Physician Certification" forms, one signed by Dr. Savin, and the other signed by Dr. Reginald Adams. (*Id.* at 24-25, 30-31.) Kimmons testified that he did not have difficulty performing his job, and he was not seeking any accommodation with respect to his actual job duties. (*Id.* at 19-20.) Dr. Savin agreed, testifying that Kimmons' cataracts would not have prevented him from performing any of the essential functions of the retention representative position listed on the "ADA – Job Description and Essential Functions" document Charter provided. (*Id.* at 26.)

On August 8, 2016, in response to his ADA Request Form, Charter approved Kimmons for a temporary, 30-day shift change. (*Id.* at 35.) He was permitted to work the 10:00 a.m. to 7:00

p.m. shift until September 6, 2016, at which point he would return to his regular shift schedule. (*Id.*) On August 29, 2016, Kimmons requested a 30-day extension on his temporary shift change. (*Id.* at 36.) Charter denied his request later that same day. (*Id.* at 37.) On September 7, 2016, Kimmons returned to the 12:00 p.m. to 9:00 p.m. shift and continued to work that schedule until his termination on January 25, 2017. (*Id.* at 38.)

Kimmons subsequently filed a charge with the EEOC alleging Charter had violated Title I of the ADA. (ECF No. 1 at 2.) On May 21, 2018, the EEOC issued a Letter of Determination to Charter finding reasonable cause to believe that the ADA was violated and inviting Charter to join with the EEOC in informal methods of conciliation to eliminate the unlawful employment practices and provide appropriate relief. (*Id.*) In June 2018, the EEOC issued to Charter a Notice of Conciliation Failure advising that the EEOC was unable to secure from Charter an acceptable conciliation agreement. (*Id.* at 3.) The EEOC then filed this case against Charter on Kimmons' behalf. (ECF No. 37 at 2.)

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## ANALYSIS

Charter argues three independent grounds on which it contends it is entitled to summary judgment: (1) Kimmons did not have a disability under the ADA; (2) even if Kimmons did have a disability, Charter was not required to accommodate Kimmons' when he could already perform all the essential functions of his job; and (3) even if Charter was required to accommodate him, Kimmons' accommodation requests were unreasonable because they would have been ineffective. (ECF No. 27 at 2.) In its summary judgment motion, the EEOC argues that the undisputed record proves that Charter unreasonably denied Kimmons an accommodation to which he was entitled under the ADA, and Charter has failed to adduce sufficient facts to support an undue hardship

defense.  (ECF No. 31 at 1-2.)  Because, as a matter of law, Charter was not required to accommodate Kimmons, Charter's motion will be granted and the EEOC's motion denied.

**I.     The ADA Does Not Require an Employer to Accommodate an Individual Who Can Perform the Essential Functions of His Job Without Such Accommodation.**

Title I of the ADA states, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. §12112(a).  Discrimination "against a qualified individual on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. §12112(b)(5)(A).  A "qualified individual" is defined as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. §12111(8).  A "reasonable accommodation" may include, among other things, "making existing facilities used by employees readily accessible to and usable by individuals with disabilities; . . . job restructuring[;] [and creating] part-time or modified work schedules[.]" 42 U.S.C. §12111(9).  It follows then, that to state a failure-to-accommodate claim under the ADA, "a plaintiff must show that: (1) [he] is a qualified individual with a disability; (2) the employer was aware of [his] disability; and (3) the employer failed to reasonably accommodate the disability."  *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005) (citing *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).

For purposes of this motion, the Court assumes that Kimmons' alleged night blindness could constitute a disability under the ADA.  *See Harris v. MatureCare of Standifer Place LLC*, No. 1:14-CV-64, 2015 WL 4662441, at *3 (E.D. Tenn. Aug. 5, 2015) (collecting Second, Third, and Ninth Circuit cases finding disabilities where plaintiffs with night blindness introduced evidence of their difficulty seeing while driving).  The parties agree both that Kimmons requested an accommodation based on this purported disability and that his accommodation request did not implicate the essential functions of his job as a retention representative.  (*See* ECF No. 28 at 2; ECF No. 36 at 15-16.)  Their dispute concerns the breadth of the ADA.  The EEOC argues that the ADA imposes a duty on employers to grant reasonable and nonburdensome accommodations permitting an employee to arrive at work, even where the proposed accommodation does not relate to an essential function of the employee's job.  (ECF No. 36 at 16-17.)  Conversely, Charter

contends the ADA does not require an employer to accommodate a disability unrelated to the employee's ability to perform his job's essential functions.  (ECF No. 28 at 21-24.)

The Seventh Circuit resolved this dispute in *Brumfield v. City of Chicago*, 735 F.3d 619 (7th Cir. 2013).  In that case, the Court explained that, "[w]hereas the ADA's other anti-discrimination provisions protect *all* qualified individuals, the reasonable-accommodation requirement applies only to the known physical or mental limitations of *otherwise* qualified individuals."  *Id.* at 632 (emphasis in original).  Thus, "an employer's accommodation duty is triggered only in situations where an individual who is qualified on paper requires an accommodation in order to be able to perform the essential functions of the job."  *Id.*  "It follows that an employer need not accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of [his] job—not because such an accommodation might be unreasonable, but because the employee is fully qualified for the job without accommodation and therefore is not entitled to an accommodation in the first place."  *Id.*  In other words, a qualified employee with a disability who can perform the essential functions of his job without an accommodation has no right to request one simply because it might improve the quality of his life outside of work.  Crucially, this is true even if the employee has a diagnosed disability that could trigger the right to accommodations under different circumstances.  The critical question is whether the employee's diagnosed disability impacts his capacity to perform his job's essential functions.  If it does not, then the employer has no obligation to accommodate it.

Nothing in the record suggests that Kimmons' night blindness hampered him as a retention representative in any way.  In fact, Kimmons testified that he had no difficulty performing any job functions while working in the Milwaukee call center.  (ECF No. 37 at 19-20.)  And he admitted that he was not seeking an accommodation related to the duties of his position.  (*Id.*)  He requested a different shift schedule not for the benefit of his performance, but the convenience of his commute.  His case is thus a dead ringer for *Brumfield*.  As there, Kimmons' disability was irrelevant to his ability to perform the essential functions of his job.  Therefore, Charter had no duty to accommodate him.

## II.    The EEOC's Attempts to Avoid *Brumfield* Are Unavailing.

The EEOC cites a litany of cases that purport to contradict the holding in *Brumfield*, but in every instance, the cited decision is either non-binding or distinguishable.  *See, e.g.*, ECF No. 50 at 6-8.  Three of the cases the EEOC relies on come from outside the Seventh Circuit.  *See Colwell*

*v. Rite Aid Corp.*, 602 F.3d 495, 505 (3d Cir. 2010) ("We therefore hold that under certain circumstances the ADA can obligate an employer to accommodate an employee's disability-related difficulties in getting to work, if reasonable."); *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1517 (2d Cir. 1995) ("Plainly there is nothing inherently unreasonable, given the stated view of Congress and the agencies responsible for overseeing the federal disability statutes, in requiring an employer to furnish an otherwise qualified disabled employee with assistance related to her ability to get to work."); *Livingston v. Fred Meyer Stores, Inc.*, 388 F. App'x. 738, 740 (9th Cir. 2010) ("We have recognized that an employer has a duty to accommodate an employee's limitations in getting to and from work."). Not only is the Court not bound by these decisions, the exact opposite is true. "A district court in Wisconsin must follow [7th Circuit] decisions, but it owes no more than respectful consideration to the views of other circuits." *U.S. v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994). The Seventh Circuit's opinion in *Brumfield* is directly on point. This Court has no power to disregard that opinion based on extra-circuit disagreement.

Perhaps recognizing the futility in trying to persuade this Court with the inapposite precedent of other circuits, the EEOC next cites to three Seventh Circuit cases for the proposition that ADA failure-to-accommodate claims are to be evaluated according to the reasonableness of the requested accommodation regardless of whether the employee can perform all essential functions of his job without such accommodation. (ECF No. 36 at 17-21.) According to Plaintiff, the Court in *Sears*, 417 F.3d at 803 held that "a reasonable jury could find that [the] employer failed to reasonably accommodate [an] employee's ability to get to work." (ECF No. 36 at 17.) Similarly, Plaintiff cites *Yochim v. Carson*, 935 F.3d 586, 591 (7th Cir. 2019), and *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1179 (7th Cir. 2013), as holding that commute-related accommodations are evaluated under the reasonableness standard. (ECF No. 36 at 19.) Plaintiff is tilting at windmills. The issue in this case is not whether the ADA might ever compel an employer to accommodate an employee's commute. If the commute is an essential job function that the employee could perform if the employer reasonably accommodated his disability, then a failure-to-accommodate claim would be evaluated according to the reasonableness standard set forth in *Sears*, *Yochim*, and *Cloe*. However, as the *Brumfield* Court plainly stated, "[t]he *Sears* formulation should not be understood to enable a plaintiff to state a failure-to-accommodate claim against [his] employer even though [he] was able to perform all essential functions of [his] job without regard to [his] physical or mental limitations." 735 F.3d at 631-32. Neither party contends

that Kimmons' commute was an essential function of his retention representative position. Accordingly, the *Sears* formulation is inapplicable.

Plaintiff's strongest appeal is to *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1066-67 (7th Cir. 2008). *See* ECF No. 36 at 18-19. In *Filar*, the district court granted summary judgment to an employer in an ADA failure-to-accommodate case on the grounds that the employee's hip condition did not affect her ability to perform the essential functions of her job as a teacher. 526 F.3d at 1066. The Seventh Circuit affirmed this ruling but "for different reasons." *Id.* at 1066-67. In concluding that the employee's requested accommodation was unreasonable, the Court noted, "[T]hat an employee can 'perform the essential functions' of a teaching position despite her disability and 'without reasonable accommodation' does not exclude her from the definition of a 'qualified individual with a disability.'" *Id.* at 1067 (quoting 42 U.S.C. §12111(8). "Instead, the question is whether her requested accommodation was reasonable, and we don't think it was." 526 F.3d at 1067. Unfortunately for Plaintiff, this is little more than a dictum. A dictum "'is a remark, an aside, concerning some rule of law or legal proposition that is not necessarily essential to the decision and lacks the authority of adjudication.'" *U.S. v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (quoting *Stover v. Stover*, 60 Md. App. 470, 476 (1984)). "It is 'a statement not addressed to the question before the court or necessary for its decision.'" *Crawley*, 837 F.2d at 292 (quoting *Am. Fam. Mut. Ins. Co. v. Shannon*, 356 N.W.2d 175, 178 (1984)). The *Filar* Court ultimately affirmed the district court based on the unreasonableness of the employee's requested accommodation. 526 F.3d at 1067. Thus, its construction of the ADA reasonable-accommodation provision was unnecessary to the outcome of the case. Accordingly, "a later court, even if it is an inferior court, is free to reject [it]." *Crawley*, 837 F.2d at 292. Indeed, the Seventh Circuit adopted a different holding years later in *Brumfield*, a precedent this Court is, as noted above, bound to follow.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment under Fed. R. Civ. P. 56 (ECF No. 31) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment under Fed. R. Civ. P. 56 (ECF No. 27) is **GRANTED**, and the case is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on December 17, 2021.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| Equal Employment Opportunity Commission | ) |
| *Plaintiff* | ) |
| v. | ) |
| Charter Communications LLC | ) |
| *Defendant* | ) |

Civil Action No.  18-cv-1333-bhl

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____
_____ .

☑ other:  Defendant Charter Communications LLC's motion for summary judgment is granted, and the case is dismissed.

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

☑ decided by Judge  Brett H. Ludwig _____ on a motion for summary judgment.

Date:  December 17, 2021 _____

*CLERK OF COURT*

Melissa P. _____

*Signature of Clerk or Deputy Clerk*