No. 22-1231

In The
# United States Court Of Appeals
## For The Seventh Circuit

Equal Employment Opportunity Commission
Plaintiff-Appellant,

v.

Charter Communications, LLC,
Defendant-Appellee.

On Appeal from the United States District Court
for the Eastern District of Wisconsin,
Civil Action No. 18-cv-1333-bhl
The Honorable Brett H. Ludwig, Presiding.

## BRIEF OF DEFENDANT-APPELLEE
## CHARTER COMMUNICATIONS, LLC

Sari M. Alamuddin
James P. Looby
Morgan, Lewis & Bockius LLP
110 N. Wacker Drive, 28th Floor
Chicago, Illinois 60606
312.324.1000

Attorneys for Charter
Communications, LLC

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1231

Short Caption: EEOC v. Charter Communications, LLC

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Charter Communications, LLC

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Morgan Lewis & Bockius LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        Charter Communications, Inc.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
        Charter Communications, Inc. owns more than 10% of Charter Communications, LLC stock. Liberty Broadband Corporation owns more than 10% of Charter Communications, Inc. stock.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    Not applicable.

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    Not applicable.

Attorney's Signature: /s/ Sari M. Alamuddin      Date: May 25, 2022

Attorney's Printed Name: Sari M. Alamuddin

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑  No ☐

Address: 110 North Wacker Drive, Suite 2800

    Chicago, IL 60606

Phone Number: 1.312.324.1158      Fax Number: 1.312.324.1001

E-Mail Address: sari.alamuddin@morganlewis.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1231

Short Caption: EEOC v. Charter Communications, LLC

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
  Charter Communications, LLC

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
  Morgan Lewis & Bockius LLP

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

      Charter Communications, Inc.

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
      Charter Communications, Inc. owns more than 10% of Charter Communications, LLC stock. Liberty Broadband Corporation owns more than 10% of Charter Communications, Inc. stock.

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  Not applicable.

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  Not applicable.

Attorney's Signature: /s/ James P. Looby          Date: May 25, 2022

Attorney's Printed Name:  James P. Looby

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address:  110 North Wacker Drive, Suite 2800

  Chicago, IL 60606

Phone Number: 1.312.324.1181          Fax Number: 1.312.324.1001

E-Mail Address: james.looby@morganlewis.com

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ....................................... i

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ....................................... ii

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES ................................................................. vi

JURISDICTIONAL STATEMENT ......................................................... 1

COUNTER-STATEMENT OF ISSUES .................................................... 1

STATEMENT OF THE CASE ............................................................... 2

I.      Charter Operates A Call Center In Milwaukee, Wisconsin .................. 2

II.     Charter Employed Kimmons From March 2016 To January 2017 ........ 4

        A.      Kimmons Applied For Work Without Disclosing Any
                Physical Limitations And Knowing He Was Not Promised
                Any Specific Shift ................................................................ 4

        B.      Kimmons Began Working For Charter In March 2016 And
                Selected A 12:00-9:00 PM Shift To Work After His Training
                Period ................................................................................ 5

        C.      Kimmons Requested A New Shift Because He Did Not
                Want To Work 12:00-9:00 PM Following His New-Hire
                Training .............................................................................. 6

                1.      Kimmons Submitted An ADA Request Form After An
                        Appointment With Dr. Bruce Savin ................................. 7

                2.      Kimmons Submitted A Second ADA Request Form
                        After An Appointment With Dr. Reginald Adams .............. 9

        D.      Charter Approved Kimmons's Request For A Temporary
                30-Day Shift Change ........................................................... 11

        E.      Charter Denied Kimmons's Request For A 30-Day
                Extension Of His Temporary Shift Change ............................. 12

        F.      Kimmons Worked The 12:00-9:00 PM Shift Without Issue
                Between September 2016 And January 2017 ........................... 13

        G.      Kimmons Was Ineligible For A Job Transfer Before And
                After He Sought An ADA Accommodation ............................... 14

H.   Kimmons Abandoned Any Purported Concerns About Driving At Night After Charter Denied His Permanent-Shift-Change Request ................................................................ 15

III.   The District Court Properly Granted Summary Judgment In Charter's Favor ................................................................ 15

SUMMARY OF THE ARGUMENT ................................................ 16

STANDARD OF REVIEW ............................................................ 20

ARGUMENT ................................................................................ 21

I.   Kimmons's Alleged Vision Impairment Is Not A Disability Under the ADA ................................................................ 22

A.   An Impairment Must "Substantially Limit" A Major Life Activity To Qualify As A "Disability." ........................................ 22

B.   Kimmons's Ability To See Is Not "Substantially Limited." ........ 24

II.   Kimmons Was Not Entitled To An Accommodation As A Matter of Law ................................................................ 29

A.   Under *Brumfield*, Kimmons Was Not Entitled To An Accommodation Because He Was Fully Able To Perform The Essential Functions Of His Job Without Accommodation ................................................................ 29

B.   *Brumfield's* Holding That Accommodations Are Only Required If Necessary To Facilitate One's Ability To Perform The Essential Functions Of A Position Is Correct ....... 40

C.   Kimmons Was Not Entitled To An Accommodation Even If The Court Narrowly Construes *Brumfield* ................................ 49

III.   Kimmons's Requested Accommodations Were Unreasonable As A Matter Of Law ................................................................ 50

A.   Accommodations Related To An Individual's Commute To/From Work Are Objectively Unreasonable When The Request Arises Out Of An Individual's Personal Choices ......... 51

B.   A Shift Change Was Not A Reasonable Accommodation ........... 53

C.   A Transfer To A Different Charter Location Was Not Reasonable ................................................................ 55

1.   Kimmons Was Ineligible For A Transfer ............................ 56

2.      Even If Kimmons Was Eligible, EEOC Cannot Satisfy
        The Other Requirements For A Transfer
        Accommodation To Be Reasonable. .................................. 56

CONCLUSION ............................................................................. 58

CERTIFICATE OF COMPLIANCE ................................................. 59

CERTIFICATE OF SERVICE ........................................................ 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albright v. Columbia Cnty. Bd. of Educ.*,
135 F. App'x 344 (11th Cir. 2005) .............................................................. 33

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................... 20

*Arnold v. County of Cook*,
2003 WL 21317270 (N.D. Ill. June 5, 2003) .............................................. 39

*Ashby v. Warrick Cnty. Sch. Corp.*,
908 F.3d 225 (7th Cir. 2018) ...................................................................... 22

*U.S. Airways, Inc. v. Barnett*,
535 U.S. 391 (2002) .............................................................. 31, 32, 50, 53

*Basden v. Prof'l Transp., Inc.*,
714 F.3d 1034 (7th Cir. 2013) .................................................................... 43

*Bay v. Cassens Transp. Co.*,
212 F.3d 969 (7th Cir. 2000) ...................................................................... 46

*Bell v. O'Reilly Auto. Enters., LLC*,
972 F.3d 21 (1st Cir. 2020) ........................................................................ 44

*Blickle v. Ill. Dep't of Child. & Fam. Servs.*,
2015 WL 5693081 (N.D. Ill. Sept. 28, 2015) ....................................... 39, 48

*Brown v. CTA Ret. Plan*,
197 F. App'x 475 (7th Cir. 2006) ................................................................ 26

*Brumfield v. City of Chicago*,
735 F.3d 619 (7th Cir. 2013)................................................................*passim*

*Bull v. Coyner*,
2000 WL 224807 (N.D. Ill. Feb. 17, 2000) ................................................ 39

*Bultemeyer v. Fort Wayne Cmty. Schs.*,
100 F.3d 1281 (7th Cir. 1996)..................................................................... 46

*Burnett v. Ocean Props., Ltd.*,
   987 F.3d 57 (1st Cir. 2021) .................................................... 34, 49

*Bush v. Compass Grp. USA, Inc.*,
   683 F. App'x 440 (6th Cir. 2017) ................................................ 56

*Capobianco v. City of New York*,
   422 F.3d 47 (2d Cir. 2005) ........................................................ 28

*Carreras v. Sajo, Garcia & Partners*,
   596 F.3d 25 (1st Cir. 2010) ........................................................ 27

*Cassimy v. Bd. of Educ. of Rockford Pub. Sch., Dist. No. 205*,
   461 F.3d 932 (7th Cir. 2006).......................................................22

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) .................................................................. 42

*Cloe v. City of Indianapolis*,
   712 F.3d 1171 (7th Cir. 2013)............................................... 47, 50

*Coghill v. Bd. of Educ. of Prince George's Cnty.*,
   2017 WL 1049470 (D. Md. Mar. 17, 2017)................................. 27

*Colwell v. Rite Aid Corp.*,
   2008 WL 4748226 (M.D. Pa. Oct. 27, 2008), *rev'd* 602 F.3d 495
   (3d Cir. 2010)................................................................ 23, 28, 38

*Corley v. United States*,
   556 U.S. 303 (2009) .................................................................. 41

*Cruz v. Perry*,
   2003 WL 1719995 (N.D. Ill. Mar. 31, 2003) ............................. 39

*D'Onofrio v. Costco Wholesale Corp.*,
   964 F.3d 1014 (11th Cir. 2020)................................................. 44

*Dalton v. Subaru-Isuzu Auto., Inc.*,
   141 F.3d 667 (7th Cir. 1998)........................................... 19, 55, 6

*Davis v. Freels*,
   583 F.2d 337 (7th Cir. 1978)........................................................6

*Dawson v. Brown*,
  803 F.3d 829 (7th Cir. 2015)........................................................ 26, 55, 57

*Dunderdale v. United Airlines, Inc.*,
  807 F.3d 849 (7th Cir. 2015).............................................................. 32, 56

*EEOC v. Ford Motor Co.*,
  782 F.3d 753 (6th Cir. 2015).................................................................... 36

*EEOC v. Kaiser Found. Health Plan of Ga., Inc.*,
  2021 WL 3508533 (N.D. Ga. Aug. 9, 2021)................................................ 50

*EEOC v. Sears, Roebuck & Co.*,
  417 F.3d 789 (7th Cir. 2005)................................................................... 35

*EEOC v. Thrivent Fin. For Lutherans*,
  700 F.3d 1044 (7th Cir. 2012).................................................................. 42

*Ekstrand v. Sch. Dist. of Somerset*,
  583 F.3d 972 (7th Cir. 2009)................................................................... 35

*Fedro v. Reno*,
  21 F.3d 1391 (7th Cir. 1994)................................................................... 46

*Felix v. Key Largo Mgmt. Corp.*,
  2021 WL 260001 (S.D. Fl. Jan. 8, 2021), *rev'd* 2021 WL
  5037570 (11th Cir. Oct. 29, 2021) .............................................................. 28

*Feist v. La. Dep't of Just.*,
  2012 WL 12884815 (E.D. La. Sept. 24, 2012), *rev'd in part* 730
  F.3d 450 (5th Cir. 2013)........................................................................ 50

*Filar v. Bd. of Educ. of City of Chi.*,
  2007 WL 79290 (N.D. Ill. Jan. 5, 2007), *rev'd on non-ADA
  claims*, 526 F.3d 1054 (7th Cir. 2008)...................................... 39, 46, 47, 48

*Fleishman v. Cont'l Cas. Co.*,
  698 F.3d 598 (7th Cir. 2012).................................................................... 24

*FTC v. Credit Bureau Ctr., LLC*,
  937 F.3d 764 (7th Cir. 2019)................................................................... 40

*Gerhartz v. Richert*,
  779 F.3d 682 (7th Cir. 2015)............................................................. 21, 47

*Gile v. United Airlines, Inc.,*
213 F.3d 365 (7th Cir. 2000)........................................................ 45

*Gile v. United Airlines, Inc.,*
95 F.3d 492 (7th Cir. 1996)........................................................ 32

*Gratzl v. Off. of Chief Judges,*
601 F.3d 674 (7th Cir. 2010)................................................ 51, 54

*Green v. United Parcel Serv. Inc.,*
847 F. App'x 207 (5th Cir. 2021) ........................................ 23, 27

*Hammel v. Eau Galle Cheese Factory,*
407 F.3d 852 (7th Cir. 2005)...................................................... 30

*Harris v. MatureCare of Standifer Place LLC,*
2015 WL 4662441 (E.D. Tenn. Aug. 5, 2015) ...................... 22, 29

*Hill v. Assocs. for Renewal in Educ., Inc.*
897 F.3d 232 (D.C. Cir. 2018)..................................................... 45

*Holly v. Clairson Indus., L.L.C.,*
492 F.3d 1247 (11th Cir. 2007).................................................. 51

*Hooper v. Proctor Health Care, Inc.,*
804 F.3d 846 (7th Cir. 2015)......................................... 32, 33, 34

*Hutchinson v. Fitzgerald Equip. Co., Inc.,*
910 F.3d 1016 (7th Cir. 2018).................................................... 26

*Intel Corp. Inv. Policy Comm. v. Sulyma,*
__ U.S. __, 140 S. Ct. 768 (2020) .............................................. 20

*Johnson v. Bd. of Trs. of Boundary Cnty. Sch. Dist. No. 101,*
666 F.3d 561 (9th Cir. 2011)...................................................... 45

*Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.,*
201 F.3d 894 (7th Cir. 2000)...................................................... 35

*Kimble v. Potter,*
2009 WL 2045379 (N.D. Ill. July 13, 2009), *aff'd* 390 F. App'x
601 (7th Cir. 2010) ..................................................................... 39

*Livingston v. Fred Meyer Stores, Inc.*,
   388 F. App'x 738 (9th Cir. 2010) ............................................................. 28, 38

*Lucas v. W.W. Grainger, Inc.*,
   257 F.3d 1249 (11th Cir. 2001) ................................................................. 46

*Luckett v. Dart*,
   2017 WL 3386117 (N.D. Ill. Aug. 7, 2017) ................................................. 45

*Lyons v. Legal Aid Soc'y*,
   68 F.3d 1512 (2d Cir. 1995) ................................................................. 38, 50

*Majors v. Gen. Elec. Co.*,
   714 F.3d 527 (7th Cir. 2013) ................................................................. 50

*Malabarba v. Chi. Trib. Co.*,
   149 F.3d 690 (7th Cir. 1998) ................................................................. 30

*McCray v. McDonough*,
   2022 WL 1203024 (E.D. Wis. Apr. 22, 2022) ............................................ 34

*McWright v. Alexander*,
   982 F.2d 222 (7th Cir. 1992) ................................................................. 50

*Northfield Ins. Co. v. City of Waukegan*,
   701 F.3d 1124 (7th Cir. 2012) ............................................................... 20

*O'Toole v. Acosta*,
   2018 WL 1469045 (N.D. Ill. Mar. 18, 2018) ............................................ 39

*Oconomowoc Residential Programs v. City of Milwaukee*,
   300 F.3d 775 (7th Cir. 2002) ................................................................. 21

*Perez v. K & B Transp., Inc.*,
   967 F.3d 651 (7th Cir. 2020) ................................................................. 20

*Perez v. Thorntons, Inc.*,
   731 F.3d 699 (7th Cir. 2013) ................................................................. 57

*PGA Tour, Inc. v. Martin*,
   532 U.S. 661 (2001) ............................................................................. 41

*Ramos v. Toperbee Corp.*,
   241 F. Supp. 3d 305 (D.P.R. 2017) ..................................................... 23, 27

*Rauen v. U.S. Tobacco Mfg. Ltd. P'ship,*
    319 F.3d 891 (7th Cir. 2003)................................................. 33, 48, 52

*Regan v. Faurecia Auto. Seating, Inc.,*
    679 F.3d 475 (6th Cir. 2012)................................................ 35, 38, 51

*Ricci v. Salzman,*
    976 F.3d 768 (7th Cir. 2020)........................................................ 48

*Robinson v. Bodman,*
    333 F. App'x 205 (9th Cir. 2009) ................................................. 38

*Sanchez v. Vilsack,*
    695 F.3d 1174 (10th Cir. 2012)............................................... 28, 50

*Schluter v. Indus. Coils, Inc.,*
    928 F. Supp. 1437 (W.D. Wis. 1996) ........................................... 28

*Scott v. Harris,*
    550 U.S. 372 (2007)..................................................................... 27

*Severson v. Heartland Woodcraft, Inc.,*
    872 F.3d 476 (7th Cir. 2017)........................................................ 53

*Springer v. Durflinger,*
    518 F.3d 479 (7th Cir. 2008)........................................................ 55

*Spurling v. C M Fine Pack, Inc.,*
    739 F.3d 1055 (7th Cir. 2014)...................................................... 35

*Swearingen v. Momentive Specialty Chems., Inc.,*
    662 F.3d 969 (7th Cir. 2011)........................................................ 55

*Taylor-Novotny v. Health All. Med. Plans, Inc.,*
    772 F.3d 478 (7th Cir. 2014)........................................................ 23

*Treadway v. Gateway Chevrolet Oldsmobile Inc.,*
    362 F.3d 971 (7th Cir. 2004)........................................................ 37

*United States v. Herman,*
    930 F.3d 872 (7th Cir. 2019)........................................................ 48

*United States v. Ritz,*
    721 F.3d 825 (7th Cir. 2013)........................................................ 40

*United States. v. Swanson*,
  635 F.3d 995 (7th Cir. 2011).......................................................... 47

*United States v. Wolfe*,
  701 F.3d 1206 (7th Cir. 2012)....................................................... 44

*Unrein v. PHC-Fort Morgan, Inc.*,
  993 F.3d 873 (10th Cir. 2021)............................................. 37, 38, 51

*Vande Zande v. State of Wis. Dep't of Admin.*,
  44 F.3d 538 (7th Cir. 1995)...................................................... 54, 56

*Wade v. Gen. Motors Corp.*,
  165 F.3d 29, 1998 WL 639162 (6th Cir. 1998)............................ 27

*Waggoner v. Olin Corp.*,
  169 F.3d 481 (7th Cir. 1999)..................................................... 35, 37

*Watson v. Lithonia Lighting*,
  304 F.3d 749 (7th Cir. 2002)........................................................ 46

*Whitaker v. Wis. Dep't of Health Servs.*,
  849 F.3d 681 (7th Cir. 2017)..................................................... 45, 54

*Yochim v. Carson*,
  935 F.3d 586 (7th Cir. 2019)..................................................... 46, 47

*Youngman v. Peoria Cnty.*,
  947 F.3d 1037 (7th Cir. 2020)...................................................... 21

*Zaffino v. Metro. Gov't of Nashville*,
  688 F. App'x 356 (6th Cir. 2017) ............................................. 35, 38

**Statutes**

42 U.S.C. § 12102(1)(A) ................................................................. 22

42 U.S.C. § 12102(2)(A) ................................................................. 22

42 U.S.C. § 12102(4)(E)(ii) ............................................................ 23

42 U.S.C. § 12111(8) ............................................................... 29, 41

42 U.S.C. § 12112(a) ............................................................... 21, 41

42 U.S.C. § 12112(b) ........................................................... 41

42 U.S.C. § 12112(b)(5) ...................................................... 29

42 U.S.C. § 12112(b)(5)(A) ............................................ 21, 41

42 U.S.C. § 12112(d) .......................................................... 42

Pub.L. 110–325, 122 Stat. 3553 (2008) ............................ 22

## Regulations

29 C.F.R. pt. 1630, app. § 1630.2(j)(1)(iv) .......................... 24

29 C.F.R. pt. 1630, app. § 1630.2(j)(1)(v) ........................... 24

29 C.F.R. pt. 1630, app. § 1630.2(o) ........................ 36, 49, 50

29 C.F.R. pt. 1630, app. § 1630.9 ...................... 32, 44, 52

29 C.F.R. § 1630.2(j)(1)(ii) ................................................ 23

29 C.F.R. § 1630.2(j)(1)(v) ................................................ 27

29 C.F.R. § 1630.2(o)(1) .............................................. 41, 49

45 C.F.R. § 84.12(a) .......................................................... 42

## Other Authorities

EEOC Enforcement Guidance: Reasonable Accommodation and
    Undue Hardship Under the ADA, No. 915.002 (Oct. 17, 2002),
    https://www.eeoc.gov/policy/docs/accommodation.html ............................ 30

EEOC Informal Discussion Letter, ADA: Reasonable
    Accommodation (6/20/01), https://www.eeoc.gov/foia/eeoc-
    informal-discussion-letter-47 ...................................................................... 37

H.R. Rep. No. 101-485(II) (1990) ("House Report"), *reprinted in*
    1990 U.S.C.C.A.N. 303, *available at* 1990 WL 125563............. 36, 38, 39, 42

https://aa.usno.navy.mil/calculated/rstt/year?ID=AA&year=2016
    &task=0&lat=43.05&lon=-
    87.95&label=Milwaukee%2C+WI&tz=6&tz_sign=-
    1&submit=Get+Data ......................................................................................6

https://wisconsindot.gov/Pages/dmv/license-drvs/rnew-and-
    chge/vision-standards.aspx ..............................................................................9

Senate Rep. No. 101-116(I) ("Senate Report") (1989) ................................ 36, 39

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Equal Employment Opportunity Commission's ("EEOC") jurisdictional statement is complete and correct.

## COUNTER-STATEMENT OF ISSUES

1.  Whether the district court incorrectly "assume[d]" "[f]or purposes of [Charter's summary judgment] motion" that a reasonable jury could find that Kimmons's alleged vision impairment "substantially limits" him in the major life activity of seeing.

2.  Whether the district court properly concluded Kimmons was not entitled to an accommodation under the Americans with Disabilities Act ("ADA") where Kimmons's commute-related issues outside the workplace were caused by his personal choices regarding where to live and how to commute to/from work, and he could perform the essential functions of his job without accommodation.

3.  If the Court assumes or finds Kimmons was entitled to an ADA accommodation for his commute-related issues, whether EEOC failed to set forth sufficient evidence for a reasonable jury to find an accommodation was otherwise "reasonable" in this case.

## STATEMENT OF THE CASE

### I.    Charter Operates A Call Center In Milwaukee, Wisconsin.

Charter operates a call center in Milwaukee, Wisconsin ("call center") with retention representatives who handle customer calls. R.37 ¶¶ 1, 10.[1] Retention representatives work staggered nine-hour shifts, with the first shift beginning at 7:00 am—new shifts beginning every hour thereafter—and the last shift beginning at 12:00 pm (and ending at 9:00 pm). *Id.* ¶¶ 8-11.

Retention-representative staffing at the call center is driven by "projections of call volume" in 15-minute increments. R.37 ¶ 12; *see id.* ¶ 81. The call center must be "staffed appropriately in order to manage the call volume" from Charter's customers. *Id.* ¶¶ 12, 17; R.49 ¶¶ 57-59. Accordingly, because Company needs often change, retention representatives are not hired to work a particular shift or schedule. R.37 ¶ 13. Rather, Charter periodically hires retention representatives as part of new-hire classes. *Id.* ¶¶ 15, 17.

Each new-hire class participates in an initial-training period encompassing one day of orientation, a "classroom training" segment, and a "practical training or nesting" segment. *Id.* ¶ 15. The classroom-training

---

[1] "R.#" refers to the district court docket entry. Page numbers refer to the CM/ECF numbers appended to each document except for citations to deposition testimony, which refer to the internal pagination/line numbers of the transcript. "Appellant Br." refers to EEOC's appellant brief, Seventh Circuit Docket 13, with page-number references to the number at the bottom of the brief. For documents included in EEOC's appendix, "A-#" refers to the page number(s) in the appendix. An appendix of the exhibits Charter submitted with its summary judgment materials is at R.43.

segment runs from 8:00 am to 5:00 pm; the practical-training segment runs from 10:00 am to 7:00 pm. R.30-15 at 2-7; R.37 ¶ 15. Each segment is five days/week. R.37 ¶ 15.

New hires select post-training shifts "at least 30 days before" the end of their training. *Id.* ¶ 16. The shift-selection process for new hires works as follows: Charter provides new-hire classes a list of available days/shifts as dictated by business need. *Id.* ¶¶ 16-17; *see* R.46 ¶ 32. Then, the names of new hires with perfect attendance records during training are put into a depository and drawn at random to determine selection order. R.37 ¶¶ 14, 16-17. Those employees then choose from the available days/shifts. *Id.* After those employees select their days/shifts, employees with the next-best attendance records are chosen at random, and so on, until everyone has selected their days/shifts. *Id.* Employees with the worst attendance records choose their days/shifts last. *Id.* ¶¶ 14, 16.

Charter does not permit representatives to agree to permanent shift swaps.[2] R.37 ¶ 21. Shifts/schedules for new hires remain fixed until the next "shift bid" for established employees (which occurs every six to twelve

---

[2] Charter permits *temporary* shift changes in limited situations, such as to accommodate a day-care or domestic-abuse issue. R.30-04 at 51:55:14-18, 76:12-77:6; R.30-32 at 61:1-24, 105:15-24; R.46 ¶ 79. The actual testimony is different from EEOC's statement "that the company had allowed shift changes as accommodations for other employees and had also allowed employees to informally switch shifts in certain situations." *Compare id.*; R.37 ¶¶ 16-21; R.49 ¶¶ 55-59, *with* Appellant Br. at 8.

months).[3] *Id.* ¶¶ 18-21. Because business needs dictate scheduling, the days/shifts made available to each new-hire class vary. *Id.* ¶¶ 12, 16-17.

## II.   Charter Employed Kimmons From March 2016 To January 2017.

### A.   Kimmons Applied For Work Without Disclosing Any Physical Limitations And Knowing He Was Not Promised Any Specific Shift.

Kimmons applied for a retention representative position at the call center in January 2016. R.37 ¶¶ 23-24. The call center in Milwaukee was "about 36 miles" from Kimmons's home in Racine, Wisconsin, and the commute was "about an hour" drive *each* way. *Id.* ¶ 25. Kimmons represented in his application that he was "willing and able to work evenings" and "a flexible schedule that may vary from week-to-week." *Id.* ¶ 24. Kimmons also checked the box indicating, "No, I don't have a disability." *Id.*

Kimmons had an initial phone-screening interview during which he learned about the position, the call center's hours, and how shifts/schedules were determined. *Id.* ¶¶ 13, 26; R.41 ¶ 11. Kimmons did not inform the phone interviewer of any restrictions with respect to his schedule or ability to work a particular shift. R.49 ¶ 15. Nor did he inform the interviewer about his alleged vision impairment. *Id.*; R. 41 ¶ 11.

---

[3] The shift bid is a process by which retention representatives bid for a preferred shift. R.49 ¶¶ 7-8. Charter ranks representatives based on performance and makes shifts available for selection based upon those rankings. *Id.* ¶¶ 8-9. Kimmons never had the opportunity to participate in a performance-based shift bid. *Id.* ¶ 10.

Kimmons later had an in-person interview with two Charter employees. R.37 ¶ 29. Charter again told Kimmons about the requirements of the position, including the call center's hours, the position's hours/shifts, and how shifts are selected. *Id.* ¶¶ 13, 30. Kimmons claims he told the two interviewers, "I just don't drive well at night," but he did not explain to them why he did not drive well at night, and he cannot recall raising anything else with respect to his ability to see or drive at night. *Id.* ¶ 29. Kimmons also claims he generally asked about a "flexible schedule," but he answered, "NONE," when asked on his application whether he had "[a]ny restrictions" with respect to shifts/schedules. R.30-5 at 40:3-41:7, 44:20-45:3; R.30-11 at 3-4.

When Kimmons accepted Charter's employment offer, he knew the call center's hours, the distance between the call center and his home in Racine, and the time required to drive from one to the other. R.37 ¶¶ 25, 31.

### B.   Kimmons Began Working For Charter In March 2016 And Selected A 12:00-9:00 PM Shift To Work After His Training Period.

Kimmons's Charter employment began in March 2016. R.37 ¶¶ 2, 31. His new-hire class went through an orientation, a classroom-training segment, and a practical-training segment. *Id.* ¶ 32. Kimmons's classroom training (8:00 am to 5:00 pm) ran from March 4 through April 10, 2016; his practical

training (10:00 am to 7:00 pm) ran from April 11 through July 7, 2016.[4] David Dunn (Kimmons's training-period supervisor) testified Kimmons drove to/from the call center throughout his training—including in darkness[5]—and complained about the traffic "going back from Milwaukee to Racine" when Kimmons "g[ot] off at 5:00" during the classroom segment. R.30-4 at 109:19-111:6; R.37 ¶¶ 4, 106.

On June 3, 2016, Kimmons's new-hire class participated in its shift-selection meeting. R.37 ¶ 33. Because Kimmons incurred attendance violations during his training, he was not one of the first individuals to choose a shift.[6] *Id.* ¶¶ 33-35; R.46 ¶ 38. Kimmons selected a 12:00-9:00 pm shift because "[t]hat was the only shift that was left." R.37 ¶ 35.

### C. Kimmons Requested A New Shift Because He Did Not Want To Work 12:00-9:00 PM Following His New-Hire Training.

With his training ending on July 7, 2016, and his 12:00-9:00 pm shift taking effect on July 8, Kimmons reached out to Dunn and Romona

---

[4] Kimmons's unchallenged time records (coupled with Dunn's testimony) debunk EEOC's assertion that Kimmons only worked "8:00 a.m. to 5:00 p.m." during his new-hire training. *Compare* R. 30-04 at 42:24-43:15; R.30-15 at 2-7 (clock-in/out times); R.37 ¶ 32, *with* Appellant Br. at 5.

[5] The sunrise and sunset times for the Milwaukee area in 2016 can be found at https://aa.usno.navy.mil/calculated/rstt/year?ID=AA&year=2016&task=0&lat=43.05&lon=-87.95&label=Milwaukee%2C+WI&tz=6&tz_sign=-1&submit=Get+Data. The Court may take judicial notice of these times for purposes of when Kimmons would have driven to/from Milwaukee. *See Davis v. Freels*, 583 F.2d 337, 339 n.2 (7th Cir. 1978) (judicial notice of sunrise time).

[6] The attendance violations were unrelated to the shift start/end time or commuting in darkness: Kimmons left one shift in the middle of the day in March 2016 and was absent for another in April 2016. R.30-13 at 2.

Henderson (then-head of the call center) to say he could not work the shift because he suffered from "night blindness" that affected his ability to drive in darkness. R.37 ¶¶ 3, 36-37. Kimmons subsequently obtained Charter's ADA paperwork to request a shift change. *Id.* ¶ 38. The job's essential functions, as listed in the paperwork, did not include driving, night vision, or seeing in the dark. *Id.* ¶ 9; *see* R.30-35.

### 1. Kimmons Submitted An ADA Request Form After An Appointment With Dr. Bruce Savin.

Kimmons provided to Charter a filled-out form titled "ADA – Employee Accommodation Request Form" and dated July 5, 2016. R.37 ¶¶ 38-39. Kimmons did not consider his "night blindness" a disability until receiving this form. *Id.* ¶ 40. Kimmons described his need for an accommodation as follows:

> My shift is from 12pm. To 9:00 pm I do not drive well after dark at night. Woud (sic) like to request a earlier shift that will allow me to be off the highways before dark, My dirve (sic) to and from work is 35 miles each way, There is no public transportation at this late hour I have meant (sic) with my doctors and they have indicated such, Vision Clinic, Michelle Titzkowski 262-637-7494 fax number 262-637-7958

*Id.* ¶ 38. With respect to the accommodation requested, Kimmons wrote:

> I would like to be on a shift starting no lather (sic) than 9:00 am. This will allow me not to have to be on the highways

*Id.* ¶ 39.

7

Kimmons testified he was living with his girlfriend at the time, Katie Davis (who lived in Milwaukee), and she had driven him to/from work whenever it was dark. *Id.* ¶¶ 112-13. Davis, however, testified she never drove Kimmons to/from work, and her relationship with Kimmons ended in 2015 when Kimmons moved to Racine. R.49 ¶¶ 90-92.

In support of his request, Kimmons submitted a form signed by Dr. Bruce Savin (an eye specialist) that was based on Dr. Savin's July 2, 2016 examination. R.37 ¶¶ 47-48, 54-55. At the examination, Kimmons's visual acuity with his glasses prescription was 20/25 in the left eye, 20/30 in the right eye, and "20/25 with both eyes together," and he had "an average" glasses prescription. R.49 ¶ 28. The only abnormality observed was "early cataracts," rated as "mild" and "trace"—mild being a "1" and trace being "less than 1" on a scale of 1 through 4. R.37 ¶¶ 51-52. Dr. Savin testified about possible symptoms cataracts "can cause," but noted that "[b]eginning cataracts for some patients [like Kimmons] don't cause them any trouble whatsoever." R.46 ¶ 8; *cf.* Appellant Br. at 4-5. He also testified cataract surgery, while likely to improve Kimmons's vision, was not necessary at that time. R. 49 ¶ 31-32; *see* R.46 ¶ 9. To the extent Kimmons was not interested in surgery, Dr. Savin suggested Kimmons "[c]onsider avoiding night driving" as a means of "addressing [Kimmons's] complaint"—not that Kimmons needed to or should avoid driving at night. R.49 ¶ 32. Dr. Savin did not recall

any discussions with Kimmons about changing his work schedule. R.30-55 at 50:7-16.

Despite Kimmons's cataracts, Dr. Savin testified Kimmons was legally able to drive at night. R.37 ¶ 50; *see* R.30-55 at 41:23-42:3; https://wisconsindot.gov/Pages/dmv/license-drvs/rnew-and-chge/vision-standards.aspx (describing standards for obtaining a valid driver's license in Wisconsin). Dr. Savin also testified Kimmons's eye condition would not have prevented him from performing any of his job's essential functions. R.37 ¶ 56.

### 2. Kimmons Submitted A Second ADA Request Form After An Appointment With Dr. Reginald Adams.

In August 2016, Kimmons submitted another "ADA – Physician Certification," dated July 27, 2016, and signed by Dr. Adams:

R.37 ¶¶ 66-67.

Dr. Adams, a "general practitioner," completed most of the form several days *before* Kimmons's appointment, which was to discuss a "chronic cough." *Id.* ¶¶ 60-62, 66, 69. Dr. Adams had examined Kimmons seven months earlier but was unaware of Kimmons's claim of difficulty driving at night until receiving that form. *Id.* ¶¶ 61, 64. There is no reference to vision next to "Diagnosis:" because Dr. Adams was also unaware when completing the form that Kimmons had any vision-related issues. *Id.* ¶¶ 58, 64, 73; R.49 ¶ 38. Dr. Adams, who is "not that well versed in eye medicine," only added the information under the heading "Major Life Activities" because Kimmons requested it. R.37 ¶¶ 70-71; R.49 ¶ 38.

Dr. Adams did not conduct a specific eye examination to verify Kimmons's symptoms. R.37 ¶¶ 65, 75; R.49 ¶ 42. Nor did he speak with anyone else (such as an eye specialist) to confirm the accuracy of Kimmons's statements. R.37 ¶ 74. Dr. Adams's progress notes from the appointment do not indicate Kimmons expressed any actual concerns regarding his vision or ability to drive (or do anything) at night. *Id.* ¶ 61.

When asked whether "Kimmons' alleged vision impairments affected his ability to perform the essential functions of [the retention representative] position," Dr. Adams testified, "No. I think it appeared as merely to get to

10

work." *Id.* ¶ 77. Dr. Adams's "assumption" was Kimmons was driving at night. *Id.* ¶ 76.

### D. Charter Approved Kimmons's Request For A Temporary 30-Day Shift Change.

Kimmons testified a shift change was the "only" accommodation request he proposed. R.30-05 at 167:11-15. Kimmons further testified:

**Question:** Did you have difficulty seeing while you worked in the call center?

**Answer:** No, I didn't.

**Question:** Did you have difficulty performing any job function of your retention rep position while you worked in the call center?

**Answer:** No, I didn't.

**Question:** Were you seeking any accommodation with respect to the actual job duties of the position?

**Answer:** No, I did not.

**Question:** What you were looking to be accommodated for was the commute, correct?

**Answer:** Correct.

R.49 ¶ 25.

Henderson met with Kimmons to discuss possible solutions beyond a permanent shift change. R.37 ¶ 78; *see, e.g.*, *id.* ¶¶ 18-21. They discussed positions "closer to [Kimmons's] home," and Henderson recommended "either Kenosha or Racine," assuming Kimmons was eligible for a transfer. R.41 ¶ 64; *see* R.30-45 ¶ 5. Charter also provided Kimmons the names of coworkers he could carpool with and directed Kimmons to Charter's application system, which had "all open [Charter] positions." R.37 ¶ 85; R.41 ¶¶ 39, 44, 63-64; *see* R.30-05 at 191:12-192:3.

On August 8, 2016, Kimmons confirmed via email that no positions closer to Racine were available:

> Just want to follow-up with you regarding our conversation on Thursday, I check with both the Kenosha and Racine store and they do not have any opening at this time. Perhaps my best solution would be to ask for a change in scheduling for 30 days, which would give me time, to make other travel arrangements. So if you could carve out sometime I would like to discuss this with you.

R.37 ¶ 78.

Later that day, Kimmons emailed Henderson: "I will be making arrangements to move to Milwaukee. Once I move I can utilize the bus system[.]" *Id.* ¶ 79. Charter in turn approved Kimmons for a 30-day change to the 10:00 am to 7:00 pm shift from August 8 through September 6, 2016. *Id.* ¶¶ 79-80. This was the same shift Kimmons had no trouble working during his practical-training segment, even when it ended in darkness. R.30-15 at 3-7. Charter granted Kimmons's request on a temporary basis, in part, due to Kimmons's representation that he only needed 30 days to rectify any commute-related issues. R.37 ¶¶ 78-79; *see also* R.41 ¶ 49.

### E. Charter Denied Kimmons's Request For A 30-Day Extension Of His Temporary Shift Change.

With his temporary shift change winding down, Kimmons tried again to avoid the 12:00-9:00 pm shift. R.37 ¶ 82. This time, the basis was a claimed

need for additional time to move to Milwaukee. *Id.* ¶¶ 82-84. On August 29, 2016, Kimmons sent an email, stating:

> I would like to request a 30 day extension on the ADA Request for change of shift hours. I have been trying to negotiate termination of my lease. However I cannot be released until October 31st, Which is the end of the lease term.

*Id.* ¶ 82. Henderson told Kimmons that Charter was unwilling to extend his commute-related accommodation and suggested Kimmons "look at other ways to manage [his] transportation." *Id.* ¶ 83. Kimmons replied:

> There is no public transportation that goes from Milwaukee to Racine that late. I would spend more money than I make to use Uber. My intentions are to move to Milwaukee.

*Id.* ¶ 84. Given business considerations and the fact Kimmons's commute remained the basis for his request, Charter did not extend Kimmons's temporary shift change. *Id.* ¶¶ 12, 81, 83, 85-87; R.41 ¶ 49. Kimmons ultimately renewed his lease in Racine at the end of October 2016 despite his previously stated intent to move to Milwaukee. R.37 ¶¶ 84; R.49 ¶¶ 53-54.

### F. Kimmons Worked The 12:00-9:00 PM Shift Without Issue Between September 2016 And January 2017.

Kimmons returned to his 12:00-9:00 pm shift on September 7, 2016. R.37 ¶ 87. He worked that shift until his termination in January 2017, for violating Charter policies. *Id.* ¶¶ 87, 95. None of the violations underlying Kimmons's termination were attendance-related. R.37 ¶ 88. In fact,

Kimmons's time records confirm he had no issue working until 9:00 pm or later. *Id.*; *see* R.30-15 at 9-15.

### G. Kimmons Was Ineligible For A Job Transfer Before And After He Sought An ADA Accommodation.

During Kimmons's employment, Charter uniformly enforced a policy prohibiting internal transfers within six months of certain Company discipline. R.30-45 ¶¶ 4-5. Accordingly, because Kimmons violated numerous Charter policies during his employment, he was ineligible for an internal transfer, regardless of locale, from April 2016 through his termination. *Id.*

Kimmons nevertheless applied for five positions after his shift-change request was denied:

- **9/13/16**: Lead Retail Sales Specialist – Greendale, Wisconsin
- **9/13/16**: Retail Sales Greeter – Milwaukee, Wisconsin
- **12/15/16**: Retail Account Executive II – Milwaukee, Wisconsin
- **1/4/17**: Spectrum Store Associate – West Allis, Wisconsin
- **1/17/17**: Spectrum Retail Account Executive 1 – Cleveland, Ohio

R.37 ¶¶ 91-92; R.43-2 ¶¶ 3-8 (citing R.43-3—43-8); R.46 ¶ 87. All were far away from Kimmons's home in Racine, and Kimmons answered in each application, "No, I don't have a disability." *Id.*; *see also* R.37 ¶¶ 89-90.

Two applications included the question, "Are you willing and able to work evenings if required by the job"; Kimmons answered, "Yes." R.37 ¶ 93. Another position's requirements included: "Travel frequently between stores in the region;" "Must have a current driver's license with a good driving

record;" "Have flexibility to work retail hours;" and "Must have reliable transportation to travel to partner locations." R.37 ¶ 93. Kimmons admits none of those requirements deterred him from applying. *Id.*

### H.    Kimmons Abandoned Any Purported Concerns About Driving At Night After Charter Denied His Permanent Shift-Change Request.

After returning to his 12:00-9:00 pm shift in September 2016, Kimmons raised no additional commute-related concerns and continued to drive himself to/from the call center at night. Indeed, Brett Przybyl (Kimmons's direct supervisor) "saw Kimmons drive his car out of the parking lot at night," and his understanding was Kimmons drove himself home every night from July 2016 through his termination. R.30-33 ¶ 5; *see* R.37 ¶¶ 5, 88, 121.

Nine months *after* Kimmons's Charter employment ended, an associate of Dr. Savin performed a "routine eye exam" on Kimmons. R.49 ¶ 74. Kimmons's vision was relatively unchanged as compared to Dr. Savin's July 2016 exam. *Id.* Kimmons rated his vision impairment as a "1 (10 Being worst)" and raised no concerns about driving at night. *Id.* ¶ 75; R.30-57 at 1; R.37 ¶¶ 97-98.

## III.   The District Court Properly Granted Summary Judgment In Charter's Favor.

The Parties filed cross-motions for summary judgment below. Rs. 27, 31. Charter argued EEOC could not establish (i) Kimmons's claimed vision

15

impairment was a disability; (ii) Kimmons was not entitled to an accommodation because any commute-related issues he had were caused by personal choices outside the workplace, and he could perform all the essential functions of his job without accommodation; and (iii) even if Kimmons was entitled to an accommodation, EEOC could not establish that a "reasonable" accommodation existed here. Rs. 28, 40, 45. Finding this case to be "a dead ringer" for the holding in *Brumfield v. City of Chicago*, 735 F.3d 619 (7th Cir. 2013), the district court granted Charter's motion and held that Charter was not required to accommodate Kimmons's commute. R.60 at 4-7 (A-4-7). In doing so, the Court "assume[d]" Kimmons's vision impairment "could constitute a disability," but did not reach Charter's alternative argument that EEOC could not establish a "reasonable" accommodation existed even if Charter had an obligation to provide one. *Id.*

## SUMMARY OF THE ARGUMENT

The ADA protects individuals with disabilities, not impairments with little impact on an individual's major life activities. The ADA also does not require employers to provide accommodations for issues an employee experiences *outside the workplace* (such one's commute to/from work) when they have no effect on the individual's ability to perform a job's essential functions—and in particular, when the issue to be accommodated arises out of the individual's personal choices such as where to live.

16

Turning a blind eye toward the ADA's goals, EEOC brought this suit claiming Charter violated the ADA when it declined to accommodate Kimmons's alleged "night blindness" by transferring him to a shift or another location that did not require him to drive to/from work in darkness. The district court granted summary judgment in Charter's favor (Rs. 60-61 (A-1-9)), and EEOC appealed. The Court should affirm for three independent reasons, each of which was raised below and has record support.

*First*, Kimmons did not have a "disability" under the ADA. Kimmons claims to suffer from "night blindness" and that he is substantially limited in his ability to see. But the *only* limitation Kimmons suffered from his alleged vision impairment was a claimed inability to "drive well at night" due to "glare" when looking directly at "overhead lights." Kimmons, however, was not restricted from driving at any time by the State of Wisconsin. Multiple witnesses also testified Kimmons could—and did—drive in the dark, including driving *an hour* home from work every night (for at least five months). In response, Kimmons does not "recall at this time" whether he has driven at night during the last five years. This does not suffice to raise a *genuine* issue of material fact as to whether Kimmons could or did drive at night.

Regardless, even if Kimmons typically avoids driving at night or was in any way impaired in his night driving, that does not render him

17

"substantially limited" in his ability to see as compared to the general population. Many individuals without disabilities often elect not to drive on certain days or at particular times for myriad reasons. Kimmons had near-perfect corrected vision, had no difficulty performing other tasks at night, and did not consider his "night blindness" to affect any aspect of his life other than driving at night. Indeed, Kimmons repeatedly self-identified as *not* having a disability and being able to work evenings and flexible schedules, and he repeatedly applied for positions far away from his home that also required him to commute at night. The district court "assume[d]" but did not decide whether Kimmons could have a disability. R.60 at 4 (A-4). Given the undisputed facts, however, the Court should affirm judgment in Charter's favor because Kimmons was not substantially limited in his ability to see.

*Second*, the ADA does not require employers to "accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of [his] job." *Brumfield*, 735 F.3d at 632. Yet, that is what Kimmons sought. It is undisputed Kimmons could perform all the essential functions of his job without issue, and he had no issues being physically present and able to work even when required to commute to/from work in darkness. EEOC claims *Brumfield* is distinguishable or should be overturned, but neither argument has merit given the ADA's purposes and statutory text. Thus, the Court

18

should affirm the district court's conclusion that Kimmons was not entitled to an accommodation.

*Third*, EEOC cannot establish any accommodation would have been "reasonable." Any commute-related issues Kimmons experienced were caused by personal choices of where to live (an hour-long drive from the call center) and how to commute to/from work (driving his own car). Charter could not control where Kimmons lived, whether public transportation was available, the cost of ride-sharing services, or traffic or weather conditions that could unexpectedly extend Kimmons's commute into darkness. Accordingly, even if the Court reconsiders *Brumfield* and focuses on the objective reasonableness of Kimmons's request, the result is the same: accommodations are objectively *unreasonable* when their purpose is to address issues outside the workplace the employee himself creates or could unilaterally resolve.

Nevertheless, even if Kimmons's accommodation request is construed as addressing a workplace issue, no reasonable jury could find any possible accommodation was otherwise reasonable. A shift change would not have been effective because no shift would have allowed Kimmons to avoid commuting in the dark year-round given Wisconsin's daylight hours. Furthermore, employers are not required to transfer employees if it would violate an employer's "legitimate, nondiscriminatory policy." *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 679 (7th Cir. 1998). Such is the case

here: Charter uniformly enforced a policy prohibiting internal transfers within six months of certain Company discipline. Under that policy, Kimmons was ineligible for a transfer. And in any event, the positions Kimmons applied for would still have required Kimmons to commute in darkness given their proximity to Kimmons's home and job requirements.

## STANDARD OF REVIEW

The Court reviews "a grant of summary judgment de novo, drawing all reasonable inferences in favor of the non-moving part[y]." *Perez v. K & B Transp., Inc.*, 967 F.3d 651, 655 (7th Cir. 2020).

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Northfield Ins. Co. v. City of Waukegan*, 701 F.3d 1124, 1128 (7th Cir. 2012). "The mere scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Additionally, "[i]f a plaintiff's denial of knowledge is 'blatantly contradicted by the record,' 'a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020) (citation omitted).

The Court's "review [on appeal] is not limited to the district court's reasons for awarding summary judgment; instead, '[the Court] may affirm a grant of summary judgment on any alternative basis found in the record as long as that basis was adequately considered by the district court and the nonmoving party had an opportunity to contest it.'" *Gerhartz v. Richert*, 779 F.3d 682, 685 (7th Cir. 2015) (citation omitted).

## ARGUMENT

The ADA prohibits discrimination against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA defines "discriminate" to include an employer's failure to make "reasonable" accommodations for "the known physical or mental limitations of an otherwise qualified . . . employee," unless the accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A).

To establish a failure-to-accommodate claim, EEOC must establish: Kimmons is both qualified and has a disability; Charter was aware of Kimmons's disability; and Charter failed to accommodate Kimmons's disability. *See, e.g.*, *Youngman v. Peoria Cnty.*, 947 F.3d 1037, 1042 (7th Cir. 2020); *see also* 42 U.S.C. § 12112(b)(5)(A). The Court should affirm the judgment because EEOC cannot establish these elements.[7]

---

[7] "[T]he definition of 'reasonable accommodation' in the Rehabilitation Act is the same as that in the ADA," *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d

## I.     Kimmons's Alleged Vision Impairment Is Not A Disability Under the ADA.

The district court did not analyze the limited symptoms associated with Kimmons's alleged "night blindness" and how his vision is actually affected compared to the general population. Instead, it "assume[d] that Kimmons's alleged night blindness could constitute a disability." R.60 at 4 (A-4) (citing *Harris v. MatureCare of Standifer Place LLC*, 2015 WL 4662441, at *3 (E.D. Tenn. Aug. 5, 2015)). That assumption was incorrect.

### A.     An Impairment Must "Substantially Limit" A Major Life Activity To Qualify As A "Disability."

The ADA defines a "disability" (as relevant) as "a physical or mental impairment that substantiality limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). EEOC contends Kimmons's vision impairment substantially limits his ability to see. *See* R.32 at 8; *see also* 42 U.S.C. § 12102(2)(A). However, "[n]ot every medical affliction amounts to, or gives rise to, a substantial limitation on a major life activity." *Cassimy v. Bd. of Educ. of Rockford Pub. Sch., Dist. No. 205*, 461 F.3d 932, 936 (7th Cir. 2006).[8] Rather:

---

775, 783 (7th Cir. 2002) (citation omitted); and courts "rely interchangeably on cases arising under either statute," *Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 230 n.10 (7th Cir. 2018).

[8] In 2008, Congress passed the ADA Amendments Act of 2008 ("ADAAA"), which addressed the scope of the ADA's coverage. *See* Pub. L. 110-325, 122 Stat. 3553 (2008). Courts have continued to rely on pre-ADAAA cases in analyzing whether an

> An impairment is a disability … if it substantially limits the ability of an individual to perform a major life activity *as compared to most people in the general population. … [N]ot every impairment will constitute a disability*[.]

29 C.F.R. § 1630.2(j)(1)(ii) (emphasis added). And for vision impairments, "[t]he ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity." 42 U.S.C. § 12102(4)(E)(ii).

Additionally, "[s]ome impairments may be disabling for particular individuals but not for others[.]" *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 494 (7th Cir. 2014) (citation omitted); *compare Green v. United Parcel Serv. Inc.*, 847 F. App'x 207, 211 (5th Cir. 2021) (vision impairment not a disability where plaintiff did "not adduce[] sufficient evidence that, compared to most people in the general population, he is substantiality limited in [his ability to see]"), *and Ramos*, 241 F. Supp. 3d at 328-29 (no disability where plaintiff had a driver's license with no time restrictions, "c[ould] drive and perform her duties at [work] during the day without any accommodation whatsoever," and "only alleged she cannot drive at night, and nothing more"); *with Colwell v. Rite Aid Corp.*, 602 F.3d 495, 498, 501-02 (3d Cir. 2010) ("monocular vision" could be a disability). EEOC

---

impairment constitutes a disability. *See, e.g.*, *Ramos v. Toperbee Corp.*, 241 F. Supp. 3d 305, 328-29 (D.P.R. 2017) (collecting cases addressing vision impairments).

"cannot rely on 'the name or diagnosis of the impairment'; rather, [it] must show 'the effect of that impairment on' [Kimmons]." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 607 (7th Cir. 2012) (citation omitted). The Court should perform an individualized inquiry to determine that the actual effects of *Kimmons's* claimed vision impairment do not "substantially limit" his ability to see compared to "other people in the general population." *E.g.*, 29 C.F.R. pt. 1630, app. § 1630.2(j)(1)(iv).

### B.    Kimmons's Ability to See Is Not "Substantially Limited."

Kimmons's glasses prescription was "average," and he had no vision issues beyond "early cataracts" best described as "mild" or "trace." R. 37 ¶¶ 51-53; R.49 ¶ 28. Dr. Savin testified Kimmons's cataracts did not at that time require surgery or any other corrective measures, and he only suggested surgery in the event they *worsened.* R.30-55, 39:23-42:3; R.37 ¶ 52; R.46 ¶ 9-10; R.49 ¶ 32. That is unsurprising. Kimmons's corrected vision with both eyes was 20/25, which is very close to 20/20—normal/perfect vision. R.30-55 at 31:20-33:16. And during an eye appointment seven months *after* his Charter employment ended, Kimmons rated his vision impairment as a "1" and raised no concerns about driving or doing anything else at night. R.49 ¶ 75; R.30-57 at 1; R.37 ¶¶ 97-98.

Other facts confirm Kimmons's vision was not "substantially limited":

- Kimmons could legally drive at night and has a valid driver's license with no restrictions beyond wearing eyeglasses. R.37 ¶¶ 50, 109.

- Kimmons had no difficulty walking, reading, or watching television at night (*id.* ¶¶ 103, 105; R.30-05 at 30:16-25); and went out to dinner, movies, and concerts (R.30-68 at 61:5-22, 62:18-25).

- Kimmons's only issue with attending social events at night relates to *finding a ride*—not actually attending events. R.30-05 at 23:24-24:12, 30:21-25, 31:1-17.; *see* R.37 ¶¶ 101-02, 105.

- Kimmons had no difficulty seeing at work or performing his job duties, including "[f]requently" using a computer. R.37 ¶ 44; *see* R.30-04 at 111:7-19; R.30-35 at 2-3.

EEOC does "[n]ot dispute[]" that the *only* limitation of Kimmons's impairment is a claimed inability to drive *well* at night because of "glare" from overhead lights. R.37 ¶¶ 100, 110; *see* R.37 ¶ 108; R.49 ¶¶ 76, 78. While Kimmons claims to avoid driving at night as a result, this did not deter Kimmons from applying for positions at Charter that would have required him to do just that. R.37 ¶¶ 25, 91, 93; R.43-2 ¶¶ 3-8. Additionally, everyone except Kimmons testified Kimmons drove himself to/from work even in darkness. *E.g.*, R.30-33 ¶ 5; R.37 ¶¶ 115-121; *see also* R.49 ¶¶ 32, 45. In response, Kimmons cannot "recall at this time" whether he has driven at night in the last five years. R.37 ¶ 111. This does not raise a *genuine* issue of material fact as to whether Kimmons could or did drive at night.[9] *See, e.g.*,

---

[9] EEOC claims "Kimmons managed to get to and from work through a combination of public transportation and rides from his girlfriend and various friends," Appellant Br. at 8, but that is belied by the undisputed facts. Kimmons testified there was *no* public

*Hutchinson v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1022-23 (7th Cir. 2018) (granting summary judgment because "[t]o infer, based on a handful of witnesses unable to recall whether [something occurred], that [something actually occurred], is impermissible speculation"); *Brown v. CTA Ret. Plan*, 197 F. App'x 475, 481 (7th Cir. 2006) (witness's "inability to remember" something "is not enough to create a disputed issue of material fact"); *see also Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (summary judgment proper because "[r]espondent's version of events [was] so utterly discredited by the record that no reasonable jury could have believed him").

Even assuming Kimmons avoids driving in darkness, no reasonable jury could find his vision is substantially limited. First, Kimmons may typically "avoid" driving at night, but that does not mean he was actually limited in his ability to do so. To the contrary, there were no legal restrictions on his ability to drive at night. R.49 ¶ 84. Second, "[t]he comparison of an

---

transportation he could utilize at night. *See, e.g.*, R.30-5 at 76:14-25, 124:19-21; R.30-16 at 2; *see also* R.37 ¶ 118 (no public transportation between Milwaukee and Racine). Kimmons testified only two friends ever drove him to/from work—one of them did it "[m]aybe three or four" times; as to the other, he "can't recall" how many times. R.30-5 at 69:5-70:17. Kimmons also "can't recall" whether his girlfriend (Davis) ever stopped driving him to/from work (R.30-5 at 67:21-69:4), while Davis testified she *never* drove him to/from work and she spoke to Kimmons on the phone after he drove himself to Racine (R.49 ¶¶ 91-92). That is unsurprising given it is "[n]ot disputed" Davis and Kimmons's relationship ended in 2015 after they moved to different cities. *Id.* ¶ 90. Without Davis, Pryzbyl, and Dunn's testimony confirming Kimmons drove home at night throughout his Charter employment (R.30-04 at 109:19-111:6; R.30-33 ¶ 5; R.49 ¶¶ 91-92), the math does not add up. *See Dawson v. Brown*, 803 F.3d 829, 834-35 (7th Cir. 2015) (affirming summary judgment where plaintiff "fail[ed] to establish a coherent narrative").

26

individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis." *See* 29 C.F.R. § 1630.2(j)(1)(v). Many people in the general population have difficulty or avoid driving at night for various reasons—including reasons completely unrelated to their vision—despite being legally able to do so. *See, e.g.*, R.49 ¶ 96 (Davis avoids "driv[ing] at night" and "in certain areas" despite no vision impairment); *Wade v. Gen. Motors Corp.*, 165 F.3d 29, 1998 WL 639162, at *2 (6th Cir. 1998) (unpublished) ("The inability to drive in darkness is a common phenomenon that, if classified as disabling, would make most of the American population over the age of 45 'disabled' under the Act. We conclude that Congress could not have intended such a result."); *cf. Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 34 (1st Cir. 2010) (summary judgment where "[t]he facts show that [plaintiff's] ability to see does not differ in a significant way from the ability to see of the general population"). Thus, because Kimmons admits he had no other limitations on his ability to see, the facts here are aligned with those in cases where courts have found a vision impairment was not a disability. *See, e.g.*, *Green*, 847 F. App'x at 211; *Ramos*, 241 F. Supp. 3d at 328-29; *Coghill v. Bd. of Educ. of Prince George's Cnty.*, 2017 WL 1049470, at *5-6 (D. Md. Mar. 17, 2017) (no disability where employee was "legally blind in her right eye" and had "20/50" vision in her

left eye, but "carrie[d] a valid driver's license" and could drive); *Schluter v. Indus. Coils, Inc.*, 928 F. Supp. 1437, 1447 (W.D. Wis. 1996) (no disability where corrected vision was "between 20/40 and 20/70 for near vision and between 20/30 and 20/60 for far vision").

Conversely, the cases on which EEOC is likely to rely are materially different and involve vision impairments with meaningful and profound effects:

- *Felix v. Key Largo Mgmt. Corp.*: Plaintiff had "retinopathy," and testified, "I cannot drive at night," and with respect to his ability to see at all times at night: "'[S]ometimes I can [see]; sometimes I cannot.'" 2021 WL 260001, at *3 (S.D. Fl. Jan. 8, 2021), *rev'd* 2021 WL 5037570, at *3-4 (11th Cir. Oct. 29, 2021).

- *Sanchez v. Vilsack*: Plaintiff suffered from "homonymous hemianopsia," which rendered her field of vision "half of what [plaintiff] could see prior to [her] injury." 695 F.3d 1174, 1179 (10th Cir. 2012).

- *Livingston v. Fred Meyer Stores, Inc.*: "Livingston's impairment prevents her from safely driving, walking, or leaving her house alone at night . . . ." 388 F. App'x 738, 740 (9th Cir. 2010).

- *Colwell v. Rite Aid Corp.*: Plaintiff suffered from "monocular vision," was blind in one eye, 602 F.3d at 498, 501-02, and "experience[d] substantial difficulties in depth perception and visual field as a result of the blindness she suffers in one eye," 2008 WL 4748226, at *5-6 (M.D. Pa. Oct. 27, 2008).

- *Capobianco v. City of New York*: "Capobianco is unable to safely walk, run, or ride a bicycle outdoors at night, except in the most familiar and well-lit surroundings; … he must avoid altogether or plan with great care independent excursions in the evening twilight, lest he find himself outdoors alone as night falls." 422 F.3d 47, 58 (2d Cir. 2005).

28

- *Harris v. MatureCare of Standifer Place, LLC*: Plaintiff testified she "cannot see at night" and "everything is blurry at night." 2015 WL 4662441, at *1, 3 (E.D. Tenn. Aug. 5, 2015); Civil No. 14-CV-64 (E.D. Tenn.), Dkt. 15-1 at 5-6 (Dep. Tr. at 13:17-23, 14:10-19).

At bottom, Kimmons's claimed vision impairment does not "substantially" limit his ability to see as compared to the general population. The Court should affirm because EEOC has not set forth sufficient evidence demonstrating Kimmons had a disability under the ADA.

## II. Kimmons Was Not Entitled To An Accommodation As A Matter of Law.

### A. Under *Brumfield*, Kimmons Was Not Entitled To An Accommodation Because He Was Fully Able To Perform The Essential Functions Of His Job Without Accommodation.

In *Brumfield v. City of Chicago*, the Court explained,

> [A]n employer need not accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of her job—not because such an accommodation might be unreasonable, but because the employee is fully qualified for the job without accommodation and therefore is not entitled to an accommodation in the first place. …

> Thus, to satisfy the first element of a failure-to-accommodate claim, the plaintiff much show that she met the employer's legitimate selection criteria and needed an accommodation to perform the essential functions of the job at issue (i.e., that she was "otherwise qualified" under 42 U.S.C. § 12112(b)(5), not merely "qualified" under § 12111(8)).

735 F.3d at 632-33 (citations omitted). Relying on *Brumfield*, the district court held that Charter "had no duty to accommodate [Kimmons]" because his request was solely for "the convenience of his commute" and "irrelevant to

29

his ability to perform the essential functions of his job." R.60 at 5 (A-5) (citation omitted). That deference to Seventh Circuit authority was proper.

Kimmons performed his position's essential functions without accommodation, had no actual attendance-related issues due to his shift, and effectively and safely commuted to/from work during his entire Charter employment. R.37 ¶¶ 44, 56, 77, 88; *see* R.46 ¶ 40. Kimmons also admits the *sole* purpose of his accommodation request was to address his commute. R.37 ¶ 44. Therefore, under *Brumfield*, Kimmons was not entitled to an accommodation.

This makes sense. The purpose of the ADA is to "remove[] *workplace* barriers" caused by disabilities—not employee-created barriers voluntarily erected outside the workplace. *See* EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the ADA, No. 915.002 ("EEOC Enforcement Guidance") (Oct. 17, 2002), https://www.eeoc.gov/policy/docs/accommodation.html. EEOC's own guidance uses the phrase "workplace barrier" 13 times. *See id.* Courts have similarly recognized that "Congress enacted the ADA to establish a 'level playing field' for our nation's disabled workers." *E.g.*, *Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 700 (7th Cir. 1998) (citation omitted); *see also Hammel v. Eau Galle Cheese Factor*, 407 F.3d 852, 867 (7th Cir. 2005) (ADA does not

mandate "[a]ccommodations which require special dispensations and preferential treatment").

It is undisputed here that:

- Kimmons accepted a job an hour-drive away from his home knowing he would have to commute in darkness during the year regardless of his shift. R.30-05 at 75:14-76:13; R.37 ¶ 25.

- Kimmons worked in Milwaukee without raising any commute or attendance-related concerns for four months—including when commuting to/from the call center in darkness—until selecting a 12:00-9:00 pm shift. R.30-04 at 109:19-111:6; R.30-15 at 2-7; R.37 ¶¶ 35, 37.

- Without any change to his vision impairment or place of residence, Kimmons claimed he needed to work a different shift after selecting a shift he did not want. R.37 ¶¶ 35-37, 61-62.

- Kimmons did not want to move to Milwaukee (despite representing he would move there), and said he would not pay for ride-sharing services either. R.37 ¶¶ 84-85; R.49 ¶ 53-54.

- After requesting a shift allowing him to avoid commuting in the dark (which was impossible), Kimmons applied for five jobs that would have required him to do exactly that. R.37 ¶¶ 91-93.

Far from creating a "level playing field" for Kimmons, an accommodation here would be a personal benefit to Kimmons *not* available to employees without disabilities (either giving him the daytime working hours he and others preferred or reducing the length of his commute) given his own personal choices, rather than a means through which he gains equal access to the workplace or the ability to work generally. *See, e.g., U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002) (accommodations are meant to allow "those

31

with disabilities to obtain the *same* workplace opportunities that those

without disabilities automatically enjoy"); 29 C.F.R. pt. 1630, app. § 1630.9

("if an adjustment or modification assists the individual throughout his or her

daily activities, on and off the job, it will be considered a personal item that

the employer is not required to provide"). Indeed, Kimmons selected a shift

pursuant to Charter's established shift-bid procedures for new hires (R.37 ¶¶

14, 16), and new and established representatives expected the Company's

shift-bid procedures would be followed in a "consistent, uniform matter,"

*Barnett*, U.S. at 404. *See, e.g.*, R.30-32 at 105:15-24; R.37 ¶¶ 17-20; R. 49 ¶¶

55-56. The ADA should not require employers to abandon such valid

employment procedures—particularly, when the employee's personal, non-

work choices are the primary basis for the requested departure. *See*

*Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 855-56 (7th Cir. 2015)

(discussing *Barnett* and explaining employer was not required to disregard

established system for bidding on shifts); *Gile v. United Airlines, Inc.*, 95 F.3d

492, 499 (7th Cir. 1996) (employers are not required to "bump" other

employees).

In *Hooper v. Proctor Health Care, Inc.*, the Court reinforced its holding in

*Brumfield* that employees are not entitled to an accommodation absent an

inability to perform a job's essential functions *because of* a disability. *See* 804

F.3d, 846, 852 (7th Cir. 2015) (rejecting accommodation request where doctor

"found that [plaintiff] was qualified for his position *without* accommodations" despite "recommend[ing] certain accommodations" that could alleviate effects of disability and improve workplace performance) (citation omitted). EEOC argues *Hooper* is distinguishable because the disability there did not "impact[] the employee's ability to travel safely to and from … where his job duties were performed." Appellant Br. at 13. But *Brumfield*'s application does not turn on the *type* of essential job function for which an individual seeks an accommodation. Like the plaintiff in *Hooper*, Kimmons was cleared to perform the essential functions of the job (including being physically present at—and able to—work at any time) without an accommodation. R.37 ¶¶ 44, 56, 76-77. If anything, Hooper's argument for an accommodation is stronger than Kimmons's: Hooper could not unilaterally resolve the effects of his disability (inside or outside the workplace), and the effects of his disability were exacerbated at work without an accommodation. *See Hooper*, 804 F.3d at 852; *cf. Rauen v. U.S. Tobacco Mfg. Ltd. P'ship*, 319 F.3d 891, 893-95, 896-97 (7th Cir. 2003) (summary judgment where plaintiff could perform all the essential functions of the position without accommodation); *Albright v. Columbia Cnty. Bd. of Educ.*, 135 F. App'x 344, 346 (11th Cir. 2005) (accommodation not required where plaintiff "did not require an accommodation to perform her job").

Because *Brumfield* is binding, EEOC seeks to circumvent its application. EEOC argues the district court misapplied *Brumfield* because an employee "cannot work at all" if he cannot "access the workplace," and there is an "inherent link between being present at the workplace—where, as here, an employee cannot perform the job remotely—and performing essential job functions," Appellant Br. at 14-17 (citations omitted). Creative rhetoric aside, Kimmons could "get to work," "access" the workplace, "get home safely from work," and be physically present and able to work at all times without issue. Accordingly, whether accommodations may be "reasonable" in some situations (*see* Appellant Br. at 15) is of no moment if Kimmons is not entitled to an accommodation in the first place. *See, e.g.*, *McCray v. McDonough*, 2022 WL 1203024, at *6 (E.D. Wis. Apr. 22, 2022) (explaining "[t]he Rehabilitation Act does not extend a remedy for the denial of accommodations that are not reasonably necessary to allow the plaintiff to perform his job") (citing *Brumfield* and *Hooper*).

Workplace "access" cases and decisions holding that in-person attendance is an essential function of non-remote positions are fundamentally different from this case. *Cf.* Appellant Br. at 17-19. In those cases, the disability *itself* inhibited the individuals' ability to physically enter the workplace or perform the job's essential functions at work irrespective of their personal choices. *Compare Burnett v. Ocean Props., Ltd.*, 987 F.3d 57, 61, 68-69 (1st Cir. 2021);

34

*EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802-03 (7th Cir. 2005);

*Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 895 n.1,

899-900 (7th Cir. 2000); *Waggoner v. Olin Corp.*, 169 F.3d 481, 482, 485 (7th

Cir. 1999), *with Zaffino v. Metro. Gov't of Nashville*, 688 F. App'x 356, 358-59

(6th Cir. 2017) (no accommodation required for "concerns about the

possibility of a longer commute and how it might aggravate [employee's]

disability"). Those individuals could not unliterally resolve the issue(s)

encountered as a result of their impairments—whether onsite or offsite.

Unlike Kimmons's request, the permissible requests were "medically

necessary" to alleviate a disability's effects *at the worksite*.[10] *See, e.g.*,

*Ekstrand v. School Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009)

(accommodations must be "medically necessary"). Accordingly, despite

EEOC's contention, the Court in *Brumfield* was not required to overrule

decisions such as *Sears* to render its decision. *Cf.* Appellant Br. at 20 n.4.

Adopting EEOC's argument would expand the ADA beyond what

Congress intended, leading to potential unfettered abuse. Just as Kimmons

---

[10] Kimmons did not, for example, suffer from narcolepsy and require a modified schedule to rectify performance issues *at work* because of the disability. *Cf. Spurling v. CM Fine Pack, Inc.*, 739 F.3d 1055, 1058-59, 1061-62 (7th Cir. 2014) (employee with narcolepsy who "experience[d] difficulty remaining conscious while at work" could make out failure-to-accommodate claim if she established "reasonable accommodation could be made that would enable her to carry out the essential functions of her job"). Still, other courts have rejected accommodations even in similar situations. *See Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 478, 480 (6th Cir. 2012).

did here, employees could routinely manufacture commute-related "attendance" issues through personal choices. For example, if an individual obtains a job in a particular location or with specific hours (but with no intention of actually working under those conditions) and then immediately claims to need an accommodation, does the ADA require the employer to immediately adjust his hours or transfer the employee to a different location?[11] What about an employee who has no commute-related issues, but voluntarily moves away from his workplace and then experiences them? Or an employee who chooses to drive to work—when public or other transportation options are available—but sometimes has difficultly driving in traffic due to an anxiety disorder? Or an employee whose most reliable source of transportation is a relative who lives nearby but will only drive the employee so far or at certain times? The list goes on. "Common sense" dictates employers should not have to decipher the motivations behind their employees' personal choices for purposes of ADA compliance. *See EEOC v. Ford Motor Co.*, 782 F.3d 753, 762 (6th Cir. 2015) (en banc) (interpret ADA

---

[11] There is no evidence Kimmons's vision changed between when Kimmons began his Charter employment and when he requested an accommodation. *See also* 29 C.F.R. pt 1630, app. § 1630.2(o) ("Reassignment is not available to applicants."); Senate Rep. No. 101-116(I) ("Senate Report"), at 130 (1989) (similar); H.R. Rep. No. 101-485(II) ("House Report"), at 63 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 303, 345, *available at* 1990 WL 125563 ("If an employee, because of disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified [may be reasonable]."); Senate Report at 129-30 (same).

using "common sense" (citing *Waggoner*, 169 F.3d at 482-84)); *see also*
*Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 976 (7th Cir.
2004) ("interpret statutes to avoid absurd results"). The only way to prevent
that is for the Court to hold that the ADA does not require accommodations
for employee-created issues outside the workplace. *See, e.g.*, *Unrein v. PHC-*
*Fort Morgan, Inc.*, 993 F.3d 873, 878-79 (10th Cir. 2021) ("Whether a
transportation barrier is caused by a broken car or legal blindness and
unreliable rides, the analysis of an employer's obligations should not change
if transportation is unrelated to an essential job function and not a privilege
of employment."). Indeed, despite its current contention that the ADA
requires commute-related accommodations arising out of personal choices,
EEOC previously explained "[t]he ADA does not require an employer to
provide such assistance as a form of reasonable accommodation; rather, it is
the employee's responsibility to arrange how s/he will get to and from work."
*See* EEOC Informal Discussion Letter, ADA: Reasonable Accommodation
(6/20/01), https://www.eeoc.gov/foia/eeoc-informal-discussion-letter-47.

The ADA's legislative history does not alter the equation. The Sixth,
Ninth, and Tenth Circuits each had the opportunity to credit the two stray
sentences EEOC highlights to support its position. *See* Appellant Br. at 15.
They were not convinced and held in analogous circumstances that employers

are *not* required to accommodate employees' commute-related issues.[12] *See Unrein*, 993 F.3d at 878-79 ("transportation barrier" is a problem "outside the workplace" and the ADA "does not require [employers] to accommodate [employees'] transportation barrier[s]"); *Zaffino*, 688 F. App'x at 358-59 ("concerns about the possibility of a longer commute and how it might aggravate her disability … are unrelated to the essential functions of [plaintiff's] job, but instead address problems she faces outside of the workplace"); *Regan*, 679 F.3d at 480 ("[ADA] does not require Faurecia to accommodate Regan's request for a commute during more convenient hours") (collecting cases); *Robinson v. Bodman*, 333 F. App'x 205, 208 (9th Cir. 2009) ("[E]mployer is not required to eliminate barriers outside the workplace that make it more difficult for the employee to get to and from work" (unless it does so for employees without disabilities).).

Additionally, other statements in the legislative history confirm the ADA does not require accommodations for commute-related "barriers" caused by personal choices." *See* House Report, 1990 U.S.C.C.A.N. at 348 ("The accommodation process focuses on the needs of a particular individual *in*

---

[12] A finding in Charter's favor would not create a new circuit split or even put this Court in the minority. The Ninth Circuit issued a decision contrary to *Robinson* in another unpublished decision. *See Livingston*, 388 F. App'x. at 740-41. The Second and Third Circuits have held the ADA contemplates commute-related accommodations. *See Colwell*, 602 F.3d at 504; *Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1517 (2d Cir. 1995). But the current trend has gone against those decisions.

*relation to problems in performance* of a particular job *because of* a physical or mental impairment.") (emphasis added); Senate Report at 132 (same); House Report, 1990 U.S.C.C.A.N. at 348 (employer should "identif[y] the barriers to job performance *caused by* the disability") (emphasis added); Senate Report at 133 (same); *see infra* pp. 42-43.

The overwhelming number of district court judges in this Circuit have agreed and held that commute-related accommodations are outside the ADA's purview. *See, e.g., Blickle v. Ill. Dept. of Child. & Fam. Servs.*, 2015 WL 5693081, at *4 (N.D. Ill. Sept. 28, 2015); *Kimble v. Potter*, 2009 WL 2045379, at *7 (N.D. Ill. July 13, 2009), *aff'd* 390 F. App'x 601, 603 (7th Cir. 2010) (affirming judgment on other grounds); *Filar v. Bd of Educ. of City of Chi.*, 2007 WL 79290, at *6 (N.D. Ill. Jan. 5, 2007), *rev'd on non-ADA claims*, 526 F.3d 1054, 1066-68 (7th Cir. 2008) (affirming judgment on other grounds); *Cruz v. Perry*, 2003 WL 1719995, at *5 (N.D. Ill. Mar. 31, 2003); *Bull v. Coyner*, 2000 WL 224807, at *7 (N.D. Ill. Feb. 17, 2000); *see also O'Toole v. Acosta*, 2018 WL 1469045, at *15 (N.D. Ill. Mar. 18, 2018) ("employers are not responsible for activities… that are affected by employees' independent decisions, such as where they live"); *Arnold v. County of Cook*, 2003 WL 21317270, at *2 n.4 (N.D. Ill. June 5, 2003) (similar); *cf.* Appellant Br. at 19 (citing two outlier decisions).

Thus, because Kimmons was able to perform the essential functions of his job without accommodation, the district court properly applied *Brumfield* in determining Charter had no obligation to accommodate Kimmons's request.

### B. *Brumfield's* Holding That Accommodations Are Only Required If Necessary To Facilitate One's Ability To Perform The Essential Functions Of A Position Is Correct.

Unable to meaningfully distinguish *Brumfield*, EEOC argues "this Court should revisit *Brumfield* pursuant to Circuit Rule 40(e) to hold that reasonable accommodations may be required even if unrelated to the performance of essential job functions." Appellant Br. at 22-33. In its three summary judgment briefs below, however, EEOC never once mentioned *Brumfield. See* Rs. 32, 36, 50. Any argument *Brumfield* was wrongly decided is waived. *See, e.g.*, *United States v. Ritz*, 721 F.3d 825, 827-28 (7th Cir. 2013).

Regardless, Circuit Rule 40(e) is typically employed "for two important purposes: to highlight a decision to create a conflict in the circuits, and to clean up earlier decisions whose soundness has been undermined by later legislation, Supreme Court activity, or a consensus among our sister circuits." *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 786 (7th Cir. 2019) (Wood, J., dissent). Neither purpose is implicated here.

EEOC's argument that accommodations are required even when not directly related to a job's essential functions is based on its own regulation

40

(29 C.F.R. § 1630.2(o)(1)). The argument, however, finds no support in the actual text of the ADA and is contrary to *Brumfield*, the ADA's legislative history, and even language in EEOC's interpretative guidance. The reasonable-accommodation provision is only implicated for "an *otherwise* qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A) (emphasis added). The inclusion of "otherwise" is notable because the ADA should not be read in a manner that renders words superfluous. *See, e.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009) (statutes "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (citation omitted); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 n.51 (2001) (dissent's reading of ADA "renders the word 'fundamentally' largely superfluous"). If Congress sought to require accommodations regardless of whether an individual required one to perform a job's essentials functions, it could have simply omitted the word "otherwise" from Section 12112(b)(5)(A). Then, the definition of "qualified individual"— i.e., "an individual who, with *or without* reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires," 42 U.S.C. § 12111(8) (emphasis added)—would apply to the reasonable-accommodation provision. Congress instead chose to differentiate what individuals and types of discrimination are covered under each provision. *See id.* § 12112(a)-(b). Because the statutory text is neither

41

silent nor ambiguous, "EEOC's regulation that interprets the statute to require accommodations for purposes beyond performance of essential job functions" (Appellant Br. at 29) is *not* entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See EEOC v. Thrivent Fin. for Lutherans*, 700 F.3d 1044, 1049 (7th Cir. 2012) (rejecting *Chevron* deference to EEOC's interpretation of 42 U.S.C. § 12112(d)).

The ADA's legislative history confirms this:

> The term "otherwise qualified" is used in this particular provision in order to clearly describe a person with a disability who meets all of an employer's job-related selection criteria *except those criteria that he or she cannot meet <u>because of</u> a disability, but which could be met with a reasonable accommodation.* See 45 CFR 84.12(a). This individual, who is "otherwise qualified" for the job, *must then be offered the reasonable accommodation* that will <u>then</u> make the individual a "qualified individual with a disability" under this title.

House Report, 1990 U.S.C.C.A.N. at 347 (emphases added). Only after an individual demonstrates he requires an accommodation to perform a job's essential functions is an employer "then" required to offer a "reasonable accommodation." *See id.* That is true even if the essential function involves access or attendance. *See, e.g.*, House Report, 1990 U.S.C.C.A.N. at 339 ("The definition of 'reasonable accommodation' in section 101(8) sets forth examples of types of accommodations that could ensure that a person with a disability will be able to perform the essential functions of a job."), 348 ("person with a

disability will know exactly what accommodation he or she will need to perform successfully in a particular job"), 462 ( "reasonable accommodation[s] should be tailored to the needs of the individual and the requirements of the job"; "Consultations between employers and the persons with disabilities will result in an accurate assessment of what is required in order to perform the job duties.").

EEOC's interpretive guidance likewise supports Charter's position: "An individual with a disability is 'otherwise qualified' … if he or she is qualified for a job, except that, because of the disability, he or she needs a reasonable accommodation to be able to perform the job's essential functions." 29 C.F.R. pt. 1630, app. § 1630.9. Put another way, if an individual does not "need[] a reasonable accommodation to be able to perform the job's essential functions," he is not entitled to one at all. *See id.*; *Brumfield*, 735 F.3d at 631-33; *see also Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) (employee's burden to establish she could "perform the essential functions of her job with a reasonable accommodation").

EEOC argues that other circuits have reached a different result than *Brumfield*, and it is "aware of no other circuit that has followed *Brumfield*['s]" interpretation of the phrase "otherwise qualified." Appellant Br. at 25, 30. Yet, at least the Eleventh Circuit has explained—consistent with *Brumfield*—that accommodations are only required when they bridge the gap

43

between (i) an individual's disability; (ii) effects caused by the disability; and (iii) how the effects caused by the disability prevent the individual from performing a job's essential functions. *See D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020) ("[I]f an employee does not require an accommodation to perform her essential job functions, then the employer is under no obligation to make an accommodation, even if the employee requests an accommodation that is reasonable and could be easily provided.") (citations omitted). But even if *Brumfield* was "out-of-step" with other circuits' decisions (Appellant Br. at 31), that would not justify the Court overturning its precedent. *See United States v. Wolfe*, 701 F.3d 1206, 1217 (7th Cir. 2012) ("Being in the minority is not enough. This is true even if the trend is against us.") (citation omitted).

Other cases the EEOC highlights actually support Charter's position that the ADA does not require commute-related accommodations necessitated by personal choices unrelated to a disability. For instance, in *Bell v. O'Reilly Auto Enterprises, LLC*, the First Circuit concluded that "instructing the jury that employee must demonstrate that he <u>needed</u> an accommodation to perform the essential functions of his job" was improper. 972 F.3d 21, 24 (1st Cir. 2020). Implicit in that decision is a requirement that—like in *Brumfield*—the disability must be the root cause of the employee's performance issues, and the accommodation must facilitate the employee's

44

ability to perform the job's essential functions in the workplace. *See id.* at 24-25; *see also Gile v. United Airlines, Inc.*, 213 F.3d 365, 368, 372-73 (7th Cir. 2000) (jury "could conclude that a shift transfer would have alleviated symptoms of [plaintiff's 'cluster of psychological disorders'] such that [plaintiff] could have performed her job"); *Luckett v. Dart*, 2017 WL 3386117, at *11, *14 (N.D. Ill. Aug. 7, 2017) (lack of accommodation "greatly exacerbated [plaintiff's] PTSD" at work). The same is true for the D.C. Circuit's decision in *Hill v. Associates for Renewal in Education, Inc.*, 897 F.3d 232, 239 (D.C. Cir. 2018) (employee needed accommodation to perform job's essential functions at work without pain); and other decisions EEOC quotes but uses ellipses to omit key language cutting against its position. *See, e.g.*, Appellant Br. at 27 (quoting *Johnson v. Bd. of Trs. of Boundary Cnty. Sch. Dist. No. 101*, 666 F.3d 561, 565-66 (9th Cir. 2011) ("[U]nless a disabled individual independently satisfies the job prerequisites, she is not 'otherwise qualified,' and the employer is not obligated to furnish any reasonable accommodation *that would enable her to perform the essential job functions*[.]")) (italicized language omitted from EEOC's brief).

Many of EEOC's other cherry-picked quotations come from cases with holdings that are inapposite or even consistent with *Brumfield. See Whitaker v. Wis. Dep't of Health Servs.*, 849 F.3d 681, 683-86 (7th Cir. 2017) (plaintiff could not satisfy attendance requirement solely because of her disability and,

thus, could not perform job's essential functions even with accommodation); *Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002) (summary judgment where plaintiff was unable to perform *any* of defendant's regular jobs, and no reasonable accommodation existed "because the ADA does not require employers to create new positions"); *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 973-76 (7th Cir. 2000) (stating in general terms that plaintiff was not "'otherwise qualified' under the ADA because he lacked the necessary DOT certification"—i.e., a requirement to perform job duties that no accommodation could resolve); *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1284-85 (7th Cir. 1996) (reversing summary judgment where plaintiff "may have been able to perform the essential functions of the job *with reasonable accommodation*" but defendant "did not give him a chance to demonstrate this"); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-60 (11th Cir. 2001) ("An accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job.") (citation omitted); *Fedro v. Reno*, 21 F.3d 1391, 1394-97 (7th Cir. 1994) (employers are not required "to find a new position for employees who are no longer able to perform the essential functions of their job due to a handicap").

Other cases, such as *Yochim v. Carson*, 935 F.3d 586 (7th Cir. 2019) and *Filar v. Board of Education of City of Chicago*, 526 F.3d 1054 (7th Cir. 2008),

also do not undercut *Brumfield*. In *Yochim*, the Court affirmed dismissal of a failure-to-accommodate claim where the requests sought were unreasonable "on [their] face." 935 F.3d at 591-92. Notably, the employer (a federal agency, which would presumably adopt EEOC's position here) did not argue to this Court that the ADA does not require commute-related accommodations. *See Yochim*, Case No. 18-3670 (7th Cir.), Dkt. 24. Thus, the Court had no reason to address Charter's argument here. *See, e.g.*, *United States v. Swanson*, 635 F.3d 995, 1003 n.2 (7th Cir. 2011) (declining to decide issues not presented on appeal). Moreover, given the Court's ultimate conclusion that plaintiff's requests were unreasonable, whether the employer was obligated to accommodate the requests in the first place was immaterial to the decision. *See Gerhartz*, 779 F.3d at 685; *see also Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176-79 (7th Cir. 2013) (concluding no reasonable jury could find employer failed to satisfy interactive-process obligations without having to address whether ADA even entitled employee to parking-related accommodation).

*Filar* is no different. EEOC claims the Court in *Filar* "adopted an interpretation of the statutory text that directly contradicts *Brumfield*'s" (Appellant Br. at 29-30), but that is incorrect. The Court's statement that the plaintiff could "still be a 'qualified individual with a disability'" even though her "hip condition did not affect her ability to teach" was dictum. 526 F.3d at

47

1067. Thus, the Court in *Brumfield* was not bound to follow it. *See, e.g.*, R.60 at 7 (A-7). Nor is the Court bound to follow it now. *See, e.g.*, *Ricci v. Salzman*, 976 F.3d 768, 773 (7th Cir. 2020) ("And dicta it was, so we are free to depart from it."); *Blickle*, 2015 WL 5693081, at *4 (relying on *Filar* district-court decision). Moreover, the defendant-appellee's brief in *Filar* provided no discussion of the ADA's legislative history, EEOC's interpretive guidance, or other relevant considerations that support Charter's position—such as the current trend of other circuits holding that the ADA does not require commute-related accommodations. *See Filar*, Case No. 07-1275 (7th Cir.), Dkt. 13; *supra* pp. 29-40.

In sum, the Court's holding in *Brumfield* that an employer's duty to accommodate an employee's disability only arises if the employee requires the accommodation to perform the essential functions of a position was correct. To the extent *Brumfield's* holding cannot be harmonized with earlier decisions, the Court should use Circuit Rule 40(e) to overturn them given *Brumfield's* straightforward answer to the question presented.[13] *See United States v. Herman*, 930 F.3d 872, 877 (7th Cir. 2019) (using Circuit Rule 40(e) to "disapprove" of earlier holdings "in tension" with the decision).

---

[13] EEOC contends *Brumfield* "is inconsistent with" Court decisions from the 1990s (Appellant Br. at 29-30) but ignores *Rauen* where the Court subsequently stated it did not decide "whether any accommodation could ever be reasonable for an employee who can perform all essential job functions without accommodation." 319 F.3d at 897. *Brumfield* answered that question.

### C. Kimmons Was Not Entitled To An Accommodation Even If The Court Narrowly Construes *Brumfield*.

EEOC's implementing regulations list three categories of reasonable accommodations: "(1) accommodations that are required to ensure equal opportunity in the application process; (2) accommodations that enable the employer's employees to perform the essential functions of the position held or desired; and (3) accommodations that enable the employer's employees with disabilities to enjoy equal benefits and privileges as are enjoyed by employees without disabilities." 29 C.F.R. pt. 1630, app., § 1630(o); *see* 29 C.F.R. § 1630.2(o)(1). Prong (1) is not at issue here, and prong (2) is inapplicable as well for reasons discussed above (*see supra* pp. 29-40). So even if *Brumfield*'s holding is construed as only addressing the second category of accommodations, only the third category remains. Yet, there is no evidence showing Kimmons was denied any "benefits and privileges" afforded to colleagues without disabilities such as fringe benefits (e.g., parental leave or use of employer-provided parking), physical access to or movement within the workplace, or freedom to pursue therapy or treatment for a condition. *Cf. Burnett*, 987 F.3d at 61-62, 69 (employee requested "push-button, automatic doors" because wrist injury impaired his ability to open "existing doors" on-site); *Feist v. La. Dep't of Just.*, 730 F.3d 450, 453 (5th Cir. 2013) (employee requested to use "on-site parking spaces" "reserved for administrative

employees and the most senior attorneys" due to a "chronic knee condition," 2012 WL 12884815, at *1 (E.D. La. Sept. 24, 2012)); *Cloe*, 712 F.3d at 1176-79 (similar); *Lyons*, 68 F.3d at 1514-17 (similar on motion to dismiss); *Sanchez*, 695 F.3d at 1182 ("transferring an employee for the purposes of treatment or therapy may be a reasonable accommodation"); *McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir. 1992) (employer denied "child-care leave [to employee with adopted child] while routinely granting such leave to biological mothers"); *EEOC v. Kaiser Found. Health Plan of Ga., Inc.*, 2021 WL 3508533, at *1, *6 (N.D. Ga. Aug. 9, 2021) (employee requested to "use a non-revolving door to enter her workplace because she has claustrophobia").

Rather, Kimmons enjoyed "the *same* workplace opportunities that those without disabilities automatically enjoy[ed]," which is all the ADA requires. *See, e.g.*, *Barnett*, 535 U.S. at 397; *see also* 29 C.F.R. pt. 1630, app. § 1630.2(o) ("[A]n accommodation is any change … that enables an individual with a disability to enjoy equal employment opportunities."). Thus, even if *Brumfield* only applies to the second category of accommodations, Kimmons still was not entitled to an accommodation.

## III. Kimmons's Requested Accommodations Were Unreasonable As A Matter Of Law.

A "plaintiff must … show that the accommodation [he] seeks is reasonable on its face." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013)

(citation omitted). Failure to do so is fatal to a failure-to-accommodate claim. *See, e.g.*, *id.* at 535-36; *Gratzl v. Off. of Chief Judges*, 601 F.3d 674, 680 (7th Cir. 2010) (burden not met "if the only accommodation [plaintiff] has ever suggested is not reasonable").

The Court should alternatively affirm the district court's decision given that EEOC has not met its burden to establish a reasonable accommodation existed because either (i) commute-related accommodations are objectively unreasonable, or (ii) no accommodation was otherwise "reasonable" in this case anyway.

### A. Accommodations Related To An Individual's Commute To/From Work Are Objectively Unreasonable When The Request Arises Out Of An Individual's Personal Choices.

Courts concluding that the ADA does not require commute-related accommodations arising out of personal choices have analyzed the issue through the lens of whether the request was "reasonable." *See, e.g.*, *Unrein*, 993 F.3d at 878 (accommodation to address a "transportation barrier" "is an unreasonable accommodation as a matter of law" because it goes to "a problem [the employee] faces outside the workplace" that the "[employee] alone has the power to eliminate"); *Regan*, 679 F.3d at 480 (plaintiff's "proposal of a modified work schedule for purposes of commuting … is not a reasonable accommodation"); *see also Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 n.16 (11th Cir. 2007) ("accommodation that does not enable

the employee to perform an essential function of his position is facially unreasonable and is not required by the ADA"); 29 C.F.R. pt. 1630, app. § 1630.9 (accommodations are only "reasonable" if "job-related, e.g., specifically assists the individual in performing the duties of a particular job"). Doing so here would be consistent with *Rauen*, where the Court considered whether the plaintiff could "perform all essential elements of her job without any accommodation" in holding that an accommodation was unreasonable. *See* 319 F.3d at 897 (finding requests related to plaintiff's disability—which made "[g]etting to work … difficult because she sometimes must stop and use the restroom on the way, and the fatigue she experiences increases her chances of falling asleep behind the wheel" on the way—were unreasonable and noting that "[plaintiff's] ability to perform the essential functions of the job without accommodation surely weighs against the reasonableness of an accommodation"). And because Kimmons's request is objectively unreasonable for the same reasons Kimmons's personal choices were the root cause of any claimed job-related issues (*see supra* pp. 29-40), the Court should affirm the judgment below even if inclined to depart from *Brumfield's* holding that employees are not entitled to an accommodation when they can perform a job's essential functions without accommodation.

### B.    A Shift Change Was Not A Reasonable Accommodation.

"An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations." *Barnett*, 535 U.S. at 400 (citation omitted); *see, e.g.*, *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017) ("effectiveness is a necessary but not sufficient condition for a reasonable accommodation"). Kimmons wanted a different shift in order to avoid driving home in the dark—purportedly, a shift starting no later than 9:00 am and ending no later than 6:00 pm. R.37 ¶¶ 38-39, 41-42, 45. But even he admits that was impossible year-round while living in Racine. R.37-05 at 75:14-76:13. During *all* of the winter months—and many others—Kimmons needed to drive in darkness at least one way.

The earliest Kimmons felt comfortable leaving in the morning during the wintertime was "[a]bout 7:00," and the latest he would feel comfortable leaving work was "[a]bout 4:00." R.37 ¶ 42. Yet, if Kimmons worked 7:00 am to 4:00 pm (earliest possible shift), he would have needed to leave by 6:00 am—before sunrise in August through mid-April (*see supra* p. 6, n. 5)—to be on time for work. Kimmons also could not have returned home before 5:00 pm, meaning he would have been driving home after sunset in mid-November through January. Those times do not account for unpredictable but common variables such as weather, traffic, and stoplights that could extend a commute into darkness at any time. Any other shift would have posed similar

issues. Thus, because a permanent shift change would not have been effective, it was unreasonable. *See Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995) ("inefficacious change would not be an accommodation of the disability at all").

Any contention Charter should have extended the temporary shift change by 30 days also fails. First, the fact Charter granted one 30-day shift change does not mean it was obligated to do so again. *See Gratzl*, 601 F.3d at 681 (employer should not be punished for going beyond ADA's requirements). Regardless, a 30-day extension would have been futile. Kimmons's lease ended at the end of October; he would have had to drive home in darkness for at least a month after the second extension ended. *See supra* p. 6, n.5. Moreover, Kimmons made a personal financial decision to renew his lease in Racine. R.49 ¶ 53. After 30, 60, or any number of days, Kimmons would have been living in Racine and commuting in the dark. *See, e.g.*, *Whitaker*, 849 F.3d at 686 (additional-leave request was unreasonable given its futility).

Relatedly, any argument Kimmons could have utilized public transit options in *Racine* after a shift change is without support. Kimmons said rideshare services were too expensive. R.37 ¶ 84. Davis testified she was unaware of *any* public transportation options between Milwaukee and Racine. *Id.* ¶ 118. And Kimmons, who had two months to locate transit options before his 30-day extension request and testified it was "accurate" 30

days was sufficient to find "other travel arrangements," could only speculate when asked about public transportation options: "I think there's a bus that runs at something (sic)." *Id.* ¶ 78; R.30-05 at 76:14-22, 123:11-23; *see* R.46 ¶ 45. If there had been plausible options, EEOC was required to provide "evidence" of them. *See, e.g.*, *Swearingen v. Momentive Specialty Chems., Inc.*, 662 F.3d 969, 974 (7th Cir. 2011); *supra* p. 25, n. 9. Yet, EEOC provides no evidence of what bus routes existed, if any, between Racine and Milwaukee; what times any bus may have run; where any bus stops were located and their proximity to Kimmons's home in Racine or the call center; or how long any commute by bus would have taken. *See Springer v. Durflinger*, 518 F.3d 479, 483-84 (7th Cir. 2008) (summary judgment is "proper" where plaintiff "has shown no independent facts—no proof—to support his claims"). Because "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture," *Dawson*, 803 F.3d at 833, this contention fails too.

## C.    A Transfer To A Different Charter Location Was Not Reasonable.

Transfers are only "reasonable" if at least three requirements are satisfied. First, the individual must be "qualified" for the position. *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 676 (7th Cir. 1998). Employers are not required "to abandon [their] legitimate, nondiscriminatory company policies." *Id.* at 678. Second, the position sought must be "vacant … at the

time the employee requests reassignment to that position." *Dunderdale*, 807

F.3d at 856 (citation omitted). Third, the proposed accommodation must be

effective. *See Vande Zande*, 44 F.3d at 542. EEOC cannot establish each of

these elements.

### 1. Kimmons Was Ineligible For A Transfer.

Employers are not required to reassign a disabled employee "when such a

transfer would violate a legitimate, nondiscriminatory policy of the

employer." *Dalton*, 141 F.3d at 679. During Kimmons's employment, Charter

uniformly *enforced* a policy prohibiting internal transfers within six months

of certain discipline. R.30-45 ¶¶ 4-5. EEOC cannot meaningfully dispute

Kimmons's discipline history made him ineligible for a transfer under

Charter's transfer policy (R.37 ¶ 94; R.45 at 15-16), and the ADA did not

require Charter to abandon it in order to transfer Kimmons. *See Dalton*, 141

F.3d at 678-80; *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 449-50

(6th Cir. 2017). Thus, a transfer was not a reasonable accommodation here.

### 2. Even If Kimmons Was Eligible, EEOC Cannot Satisfy The Other Requirements For A Transfer Accommodation To Be Reasonable.

Kimmons applied for five Charter positions from September 2016 through

January 2017 (*see supra* p. 14); however, a transfer to any of them would

have remained unreasonable. First, no position would have been effective in

resolving Kimmons's claimed commute-related issues. Kimmons testified the

positions may have been in Kenosha or Racine, but his contemporaneous email (R.30-22 at 4) and Charter's internal records (R.43-2 ¶¶ 2-3) conclusively debunk that testimony: four were in Milwaukee or its surrounding suburbs, and the fifth was in Cleveland, Ohio. *See also* R.46 ¶ 87; R.49 ¶ 63; *Perez v. Thorntons, Inc.*, 731 F.3d 699, 716 (7th Cir. 2013) ("guesswork and speculation are not enough to avoid summary judgment") (citation omitted). Even after a transfer, Kimmons's commute would not have meaningfully changed.

Relatedly, beyond their geographic locations, two positions required Kimmons to work evening shifts while another would have required Kimmons to "[t]ravel frequently between stores in the region" even while working retail hours. R.37 ¶ 93. Kimmons would have been driving in darkness more often than he did as a retention representative.

In short, either a transfer would have been ineffective at resolving Kimmons's commute-related issues or Kimmons's applications for positions with the same commute issues confirm his motivations for a shift change were unrelated to his vision. Either situation requires the Court to affirm. *See, e.g.*, *Dawson*, 803 F.3d at 834-35.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment in Charter's favor. *Alternatively*, the Court should remand the case and order the district court to make a specific finding as to whether a reasonable jury could find in EEOC's favor as to (i) whether Kimmons's alleged vision impairment constitutes a disability under the ADA, and (ii) whether a "reasonable" accommodation existed (even assuming the ADA contemplates commute-related accommodations arising out of personal choices).

Dated: May 25, 2022                Respectfully Submitted,

                                   */s/ Sari M. Alamuddin*

                                   Sari M. Alamuddin
                                   James P. Looby
                                   Morgan, Lewis & Bockius LLP
                                   110 N. Wacker Drive, 28th Floor
                                   Chicago, Illinois 60606
                                   312.324.1000

                                   Attorneys for Defendant-Appellee
                                   Charter Communications, LLC

## CERTIFICATE OF COMPLIANCE

I, Sari M. Alamuddin, an attorney, certify that the foregoing Brief of Defendant-Appellee Charter Communications, LLC complies with the type-volume limitation prescribed in Fed. R. App. P. 32(a)(7)(B). This document contains 13,988 words, including the words in the pictures on page 9, but excluding the parts of the document exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

/s/ *Sari M. Alamuddin*
Sari M. Alamuddin

## CERTIFICATE OF SERVICE

I, Sari M. Alamuddin, an attorney, certify that on May 25, 2022, a copy of the foregoing Brief of Defendant-Appellee Charter Communications was filed with the Clerk of the Court through the Court's CM/ECF system. Participants in the case are registered CM/ECF users, and service will be effectuated through the Court's CM/ECF system.

/s/ *Sari M. Alamuddin*
Sari M. Alamuddin